**Alfred R. PIERCE, Appellant,**

v.

**CAPITAL CITIES COMMUNICATIONS, INC., a Pennsylvania Corporation, and Richard Kellman.**

**No. 77–1470.**

United States Court of Appeals, Third Circuit.

Argued Jan. 13, 1978.

Decided April 12, 1978.

Henry Thomas Dolan, Criden, Johanson, Dolan, Morrissey & Cook, Philadelphia, Pa., for appellant.

Gregory M. Harvey, Morgan, Lewis & Bockius, Elihu A. Greenhouse, Philadelphia, Pa., for appellees.

Before ADAMS and WEIS, Circuit Judges, and COOLAHAN, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

We are presented here with a clash between two basic norms in our legal system. One concerns the valued right of a person

---

* Honorable James A. Coolahan, U.S. District Judge for the District of New Jersey, sitting by designation.

to be protected against inaccurate statements harming his reputation. The other deals with one of the most indispensable freedoms in a democratic state, namely, that of untrammeled expression regarding the conduct of a public official. Although the reconciliation of these principles in the context of a particular factual configuration seldom will be easy, it is essential to the healthy survival of each. That is the task which this Court is now called upon to perform.

The plaintiff's objection to the publication he challenges—a television broadcast—is that it gave rise to innuendoes which are defamatory of him. Specifically, Alfred R. Pierce claims that a broadcast by Capital Cities Communications, Inc., owner and operator of a Philadelphia television station, WPVI–TV, and Richard Kellman, a reporter for the station, defamed him by creating the false impression that he had misused his public position in seeking private pecuniary gain. In response, the defendants urge that the First Amendment analysis in the landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and in succeeding decisions, which protect speech about public officials absent a showing of "actual malice," bars recovery in the present situation.[1]

### A.

Pierce was the Mayor of Camden, New Jersey, for a ten-year period ending in 1969, and a Commissioner of the Delaware River Port Authority from June 4, 1962, until May 11, 1970. From January 1, 1969, until May 11, 1970, he was Chairman of the Authority.[2]

On November 30, 1973, more than three years after Pierce was last a member of the Port Authority, WPVI–TV televised a program, entitled "Public Bridges and Private Riches," which explored the activities of the Port Authority and, in particular, the performance of Ralph Cornell, then its Chairman.[3] During the broadcast, Pierce was named approximately five times in his capacity as former Camden Mayor and Port Authority Chairman.

Since Pierce's position is that the television program as a whole was actionable as to him, even if no single remark in it was defamatory, it is necessary to set forth in some detail its major aspects. The introduction included a statement that, while preparing for the broadcast, "Action News reporter, Richard Kellman" travelled "the bridges of the Delaware River Port Authority and the high speed road to profit."[4] The structure of the Port Authority, the cost of its projects and the use of tolls to pay its debts were then described.

Following the introduction, a segment of the telecast dealt with a cost increase for steel lattice work essential to building the superstructure of the Commodore Barry

1. The parties did not address the question whether the applicable state law of defamation gives rise to a tort. Since that issue is of importance in a full analysis of this case, it is considered in part C of the opinion.

2. The Delaware River Port Authority, a bi-state agency involving Pennsylvania and New Jersey, has a total of eight commissioners representing each of the two participating states. *See* 36 Pa.Stat.Ann. § 3503, Article II (Purdon's Supp.1977).

3. As the district court wrote, the program in question was designed to "explore the activities of the Delaware River Port Authority and the performance of the Chairman, Ralph Cornell; this program was part of a series of news broadcasts on issues of public concern." In his deposition, Pierce stated that he believed that "the principal focus of the broadcast was Ralph

Cornell, with Al Pierce to be thrown into the meat grinder for good measure."

4. The introduction of the broadcast was the following:

When Washington crossed the Delaware River, it was absolutely free. When Action News reporter, Richard Kellman, crossed the Delaware River, it cost him sixty cents. Washington's crossing brought us a nation. Kellman's crossing brought us some incredible findings that go right into your pockets. For 90 days now, Action News reporter Richard Kellman has traveled the bridges of the Delaware River Port Authority and the high speed road to profit. In a minute, Action News presents Public Bridges and Private Riches but hold onto your dollars. After this program you may want to swim across the Delaware River.

Bridge. A controversy in 1969 among the members of the Port Authority, relating to the desirability of seeking new bids on the contract for steel, was elaborated, and statements by two participants in the dispute, including Ralph Cornell, were juxtaposed. Then Kellman displayed the minutes of a Port Authority meeting held on September 17, 1969, which recorded the votes on a motion for new bids on the steel contract, and he stated that "New Jersey commissioners voting 'no' included Chairman Alfred R. Pierce and the present Chairman Ralph Cornell." At the conclusion of this portion of the program, Kellman narrated:

> And so . . . as the toll-payers shelled out nickels, dimes and quarters to pay for the project—some Port Authority commissioners saw an opportunity for enormous profits, profits on land deals made possible by the very bridge motorists would be paying for well into the year 2000.

After a pause for a commercial announcement, the program showed Kellman noting that there was a close relationship between the construction of the Commodore Barry Bridge, which runs from Chester, Pennsylvania to Bridgeport, New Jersey, and the increase in land values in the Bridgeport area. The mayor of Bridgeport was quoted as saying that the values of land in the town had risen directly as a result of the construction of the bridge. As to Pierce's own interest in land in the vicinity of the Commodore Barry Bridge, Kellman remarked:

> Among the properties with identifiable owners . . . is this 90-acre plot of Route 322 . . . where the expressway linking Routes 130 and 295 will be built. The deed is recorded at the Gloucester County Courthouse in Woodbury. It shows the property is owned by Alfred R. Pierce . . . former Mayor of Camden and Port Authority Chairman at the time the Barry bridge was approved. On the day Pierce bought his 90 acres . . . he also bought 22 acres more . . . just across the road . . . and on the same day . . . in April

of last year . . . he sold the 22 acres to a corporation that also has the deed to 67 acres farther up the road where Route 322 crossed Route 295.

The broadcast proceeded to focus on the development of the Lindenwold Hi-Speed Line, a mass transit facility that was built and is operated under the auspices of the Port Authority and runs from Philadelphia to Lindenwold, New Jersey. Kellman indicated that "(t)here's talk of extending the Hi-Speed Line past Lindenwold to the Jersey Shore" in the event of the areas' continued expansion, residentially and commercially. Certain land near the Ferry Avenue station of the Lindenwold Hi-Speed Line, described as "prime commercial property," was said to be owned by "a combine called ABJ, Inc.," whose shareholders "include former Camden Mayor and Port Authority Chairman Alfred R. Pierce."

Kellman mentioned a third parcel of real estate in which Pierce was portrayed as having an interest that was said to be located in Woodbury, New Jersey, near a proposed extension of the Hi-Speed Line. As Kellman said:

> A Port Authority study recommended the Gloucester route to Woodbury where there are five acres of land owned by a corporation that includes as shareholders former Camden Mayor and Port Authority Chairman Alfred Pierce and former Port Authority Commissioner John Crisconi of Philadelphia.

.    .    .    .    .

> In mid-October, Port Authority engineers confirmed their recommendation that the Woodbury station would be built here, adjacent to the propoerty (sic) owned in part by Pierce, Crisconi and Cornell.

In the aftermath of those remarks, Kellman questioned Cornell about the "guidelines" he followed in his work in order to avoid a conflict of interest, and Cornell replied that he adhered to "the ten commandments." A prominent Philadelphia banker, John Bunting, who has since been appointed to the Port Authority, was quoted as saying that, in his view, "certainly buying land raises doubts."

Kellman then explained that the director of bridges for the Port Authority, Andrew Ferenz, had been fined and given a suspended jail sentence for "using Port Authority building materials on his own home." Ferenz was described as the brother-in-law of "former Camden Mayor and Port Authority Chairman, Alfred R. Pierce."

On May 16, 1974, five-and-one-half months after the airing of the broadcast, Pierce filed a complaint, predicated on diversity jurisdiction, charging that the television program falsely "accused plaintiff of acting in his own selfish interest and in abuse of his public trust." Pierce also alleged that harmful "innuendoes" arising from it subjected him to "public ridicule, contempt, and humiliation," injuring his "good name and reputation" and thereby defaming him. He sought compensatory damages in the amount of two million dollars, as well as punitive damages for the same sum.[5] After the defendants filed an answer, there was extensive pre-trial discovery. On the basis of the information acquired during discovery, the defendants moved for summary judgment.

The district court, in an opinion and order dated February 7, 1977, 427 F.Supp. 180, held that the application of the principles enunciated in *New York Times* required a grant of summary judgment on behalf of the defendants, for Pierce had not set forth sufficient facts showing, as a public official is required to do, that the publication in question, even if defamatory, was made with "knowledge that it was false or with reckless disregard of whether it was false or not."[6]

### B.

Pierce urges that the district court erred in not fully considering the harmful innuendoes, or the inferences drawn from context, that necessarily flowed from the language and composition of the television broadcast viewed as a whole.[7] If one takes account of such innuendoes, Pierce submits, it can only be concluded that the requirement of a showing of "actual malice" established by *New York Times* does not bar recovery here.

It is maintained by Pierce, for instance, that the discussion in the broadcast of the 1969 vote by members of the Port Authority over rebidding a contract for steel to be used in constructing the Commodore Barry Bridge raised the incorrect implication that Pierce had cast his vote in order to expedite the construction, and thereby accelerate his realization of profits from the resale of land he had acquired near the bridge. Also, Pierce charges that the broadcast impliedly suggested—again, falsely—that he had used knowledge gained as a public official in making his private acquisitions of real estate. Further, Pierce claims that the opinions expressed in the program, such as by John Bunting, to the effect that land purchases by Port Authority Commissioners are improper, and the program's title, "Pub-

---

5. To receive punitive damages for a tort, it is required, under Pennsylvania law, that a plaintiff establish that the tortious conduct in question was "outrageous." *See McSparran v. Pennsylvania Railroad Co.*, 258 F.Supp. 130, 134 (E.D.Pa.1966); *Chambers v. Montgomery*, 411 Pa. 339, 192 A.2d 355, 358 (Pa.1963); *Focht v. Rabada*, 217 Pa.Super. 35, 268 A.2d 157, 159 (1970); *Restatement, Torts* § 908(1) (1939). *See generally Medvecz v. Choi*, 569 F.2d 1221, No. 77–1240 (3d Cir., filed Dec. 22, 1977). Additionally, in a defamation action, the requirements of *New York Times* must of course be met. *Cf. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

6. 376 U.S. at 280, 84 S.Ct. at 726.

7. The term "innuendo" has two possible meanings in the law of defamation, one of which is technical and the other of which is not. The narrow, technical meaning of the term is associated with the common law system of pleading, under which an "innuendo" was an explanation of the defamatory meaning of a communication in light of extrinsic circumstances, the existence of which was averred to in a prefatory statement called an "inducement." *See Restatement, Second, Torts*, § 563, comment (f) (1977). That is *not* the meaning of the word as employed in this opinion. The second, and here the relevant, meaning of "innuendo" is that which it has in common language, namely, the insinuation or implication which arises from the literal language used in a statement or set of comments.

lic Bridges and Private Riches," tended to defame him contextually, although admittedly not literally.[8]

Defendants' knowing or reckless disregard of the falsity of the publication, Pierce suggests, may be inferred from the fact that the broadcast, while it mentioned him in connection with three real estate transactions, did not explicitly reject the implication that Pierce had utilized insider information in buying the land in question. He points in particular to Kellman's deposition and to memoranda written by Kellman to his superiors during the preparation of the program which, Pierce claims, demonstrate that the reporter fully recognized that Pierce's purchases occurred *after* he had left office and *after* the public had been told of the Port Authority projects in question—even though, in the broadcast, the time sequence was not made clear.[9]

In response, the defendants press the point that Pierce has not been able to identify any specific statement in the telecast relating to him that is false other than the comment—which defendants claim is immaterial in any event—that he is the brother-in-law of Andrew Ferenz.[10] Defendants note that, in this appeal, Pierce appears to have abandoned the argument that the remark about Pierce's relationship with Ferenz may be construed as having defamed him. Even so, defendants stress, there is no indication in the record that they knew or had reason to know of the falsity of their identification of Ferenz as Pierce's brother-in-law.[11]

Further, the defendants contend that the various, allegedly harmful "innuendoes" ascribed to the broadcast are incapable, under *New York Times* and succeeding decisions, of giving rise to actionable defamation. With respect to the program's title and its introduction, which purportedly paint a picture of less-than-scrupulous activity by members of the Port Authority, the defendants maintain that such language should be perceived as the kind of hyperbole or colorful phraseology that is protected by the First Amendment. And as to the observation by Bunting that in his view purchases of land by Port Authority Commissioners are questionable, defendants suggest that such a statement is precisely the sort of opinion about public affairs which should be accorded constitutional protection.

Also, regarding the plaintiff's contention that defamatory innuendoes arose from the defendants' failure to negative the possibility that Pierce acted improperly by purchasing three parcels of real estate, the defendants emphasize that such a position depends fundamentally on an interpretation of various aspects of the broadcast, not on anything directly said in it. When the cited innuendoes are taken in turn, it is argued, the constitutional standard cannot be met.

Specifically, as to the supposed "innuendo" arising from the discussion of the vote regarding rebidding of the contract for steel for the Commodore Barry Bridge, defendants argue, first, that nothing was said

8. Pierce also objects to the program's introductory comments which, he claims, provided the impression of official wrongdoing on the part of Port Authority members and, consequently, impugned Pierce's reputation since he had served on the Authority during the relevant period of time.

9. As Pierce's brief summarizes the point:
The broadcast named plaintiff as holding a partial ownership interest in three specifically identified properties, the 90-acre tract on Route 322, the 5¼ acres in Woodbury, and the small parcel at the Ferry Avenue Station of the Hi-Speed Line. As to every one of these three, plaintiff submits, the defendant Kellman conceded that by air time of his broadcast he had no foundation in fact or otherwise for the inference his statement in-

vited, that plaintiff had used knowledge to which he was privy in his official position for his private profit.
Thus, Pierce submits, the defendants knew of the falsity of the innuendoes arising from the utterances made in the television broadcast, or at the least acted in reckless disregard of their falsity.

10. It appears from the record that Pierce and Ferenz are married to cousins instead of to siblings.

11. The record indicates that reporter Kellman was informed by persons associated with Pierce that Pierce was Ferenz's brother-in-law and that Pierce had been so identified in published sources.

in the program to the effect that Pierce voted "no" on the rebidding proposal in order to speed up the receipt of profits from the sale of land near the bridge. Moreover, it was stated that Pierce's purchase of real estate near the bridge occurred in "April of last year," which would have been in April of 1972, the year prior to the broadcast. Since the controversy about the rebidding of the steel contract occurred in 1969, defendants argue, it is plainly unreasonable to conclude that the broadcast created the misimpression that Pierce owned the land on the occasion of the crucial vote.

Because the program did include the time sequence of the vote on the steel contract and of Pierce's acquisitions of land near the Commodore Barry Bridge, defendants declare also that it cannot be claimed that the broadcast raised the inaccurate implication that Pierce approved the location of the Commodore Barry Bridge at the time that he owned land near where the bridge ultimately was built. Again because the relevant timing was stated in the broadcast, defendants further contend that it is unreasonable to conclude that it created the false impression that Pierce took advantage of insider information when he initially bought the real estate near the Commodore Barry Bridge.

As to the other two parcels of land in which Pierce had an interest—those near an existing, as well as a proposed, station of the Hi-Speed Line—defendants concede that the program did not provide the time sequence of official action and of Pierce's purchases. Despite that omission, defendants would have us affirm the district court's ruling. For, they stress, Pierce was said to have owned the two plots in question jointly with Ralph Cornell, then the

incumbent Chairman of the Port Authority. Since such a revelation is the sort of comment about a public official that should be accorded protection under the First Amendment, and since some compression of facts relating to an item covered in a television broadcast is inevitable, defendants argue that no policy of the First Amendment would be served, and key ones would be undermined, by concluding that the statements about the Ferry Avenue and Woodbury real estate constituted actionable defamation.

Regarding Kellman's deposition and his memoranda to his superiors, defendants insist that they fail to display the existence of any knowing or reckless disregard of falsity—but rather indicate only that the defendants wondered whether to charge the plaintiff with a conflict of interest, and decided ultimately not to do so.[12]

### C.

█ In resolving this dispute, we initially consider the governing tort law in order to ascertain whether, in the present situation, defamation has occurred. For before investigating whether the constitutional principles of *New York Times* operate to bar recovery, it would appear appropriate to ask whether a state tort has arisen in the first place. Moreover, since our jurisdiction over the case is predicated upon the diversity of the citizenship of the parties, under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) and its progeny, we are admonished to start with the applicable state law.[13]

A threshold question in this regard is which state's law should be utilized. The parties indicated, at oral argument, that the

---

12. As to Pierce's objection to a circular distributed by the television station to potential advertisers, which indicated that the program would make revelations about "nepotism" in the operation of the Port Authority, defendants point out that the use of the word was clearly not in reference to Pierce but rather, as the program indicated, was directed at the activities of Chairman Cornell.

13. Although a federal diversity court should not develop a wholly independent federal standard with which to determine issues of substantive right, it also should not apply state law in an unduly narrow and mechanical manner. Rather, a federal court should consider carefully the underlying principles and policies embodied in state precedents. *See Medvecz v. Choi*, 569 F.2d 1221, No. 77–1240, n.14 (3d Cir., filed Dec. 22, 1977). *Cf. Quinones v. United States*, 492 F.2d 1269, 1276–79 (3d Cir. 1974).

law of Pennsylvania governs. Such a position apparently rests on the fact that the business activities of the television station and the reporter charged with defamation are based in Philadelphia and, as a result, that jurisdiction has an abiding interest in the lawsuit.[14] In the absence of any suggestion that there exists here a true conflict of law—that is, that Pennsylvania law differs from that of another interested forum having a strong competing stake in the case arguably outweighing Pennsylvania's interest—there is no occasion to diverge from the parties' position. This being so, we must decide what resolution a Pennsylvania court would reach with regard to the issues in the present appeal.

■ Pennsylvania has adopted the definition of defamation incorporated in the *Restatement, Torts* § 559 (1938), which provides:

A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.[15]

In Pennsylvania as well as under the *Restatement*, whether or not language can reasonably be construed as defamatory is a question of law to be determined by a court.[16]

■ Ascertaining whether a communication is capable of a defamatory meaning depends upon what a recipient "correctly, or mistakenly but reasonably, understands" that the statement was intended to express.[17] It is established that a court should not scrutinize simply the literal references of the language in question, but also should weigh the words "together with their context." *Restatement, Second, Torts* § 563, Comment (d). In Pennsylvania, the burden of proving that a statement is defamatory—as well as establishing its publication by the defendant, its application to the plaintiff, and the recipient's understanding of its defamatory meaning—is on the plaintiff.[18]

Under Pennsylvania cases handed down after the Supreme Court decided *New York Times*, the definition of defamatory speech has been held to include consideration of the constitutional principles articulated in that seminal opinion. Thus, even though in analyzing this case we start with Pennsylvania tort law, no rigid line of demarcation may be maintained between state law rules and constitutional norms, for both are intermixed in the Pennsylvania precedents.[19]

In *Redding v. Carlton*,[20] it was concluded that the challenged allegations, which were published during a campaign to prevent the

---

**14.** *See Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 21, 203 A.2d 796, 805 (Pa.1964) (". . . the strict lex loci delicti rule should be abandoned in Pennsylvania in favor of a more flexible rule which permits analysis of the policies and interests underlying the particular issue before the court.") *See also Cipolla v. Shaposka*, 439 Pa. 563, 267 A.2d 854, 855–56 (Pa. 1970).

**15.** *See Cosgrove Studio and Camera Shop, Inc. v. Pane*, 408 Pa. 314, 182 A.2d 751, 753 (Pa. 1962). *See also Corabi v. Curtis Publishing Co.*, 408 Pa. 314, 273 A.2d 899, 904 (Pa.1971). The definition in the *Restatement, Torts* (1939) was carried over intact to the *Restatement, Second, Torts* § 559 (1977).

**16.** *See Corabi v. Curtis Publishing Co.*, 408 Pa. 314, 273 A.2d 899, 904 (Pa.1971) ("If the court determines that the statement is capable of a defamatory meaning, it is for the jury to determine whether it was so understood by the recipient . . . .."). *See also Restatement, Second, Torts* § 614 (1977):

(1) The court determines
(a) whether a communication is capable of bearing a particular meaning, and
(b) whether that meaning is defamatory.
(2) The jury determines whether a communication, capable of a defamatory meaning, was so understood by its recipient.

**17.** *Restatement, Second, Torts* § 563 (1977).

**18.** *See* 12 Pa.Stat.Ann. § 1584a. (Purdon's Supp. 1977).

**19.** This intermixture in the cases represents a certain lack of analytical clarity, for a defamation decision does involve two separate sorts of inquiries: first, is there an infringement of a state-protected right to be free from a tortious invasion of one's reputation?; and second, even if there is, does the First Amendment nonetheless preclude recovery?

**20.** 223 Pa.Super. 136, 296 A.2d 880 (Pa.Super. 1972).

purchase of a proposed building site for a township headquarters and referred to the town supervisor's dual role as supervisor and landowner, were not libelous. The defendant had complained that the supervisor's position evidenced a "'conflict of interests at the very least, and perhaps much more.'" In analyzing whether such a remark may be said to be defamatory, the Pennsylvania court declared that "(f)ree speech would be endangered if innocuous statements were found capable of possessing a defamatory meaning." It is necessary, the court underscored, to decide whether a defamation has occurred in light of the principles enunciated in *New York Times*—namely, that our country has a "profound commitment" to the notion that debate on public matters should be "uninhibited, robust, and wide-open," and that our nation's political and moral undertaking presupposes that some "unpleasantly sharp attacks on government and public officials must be protected."[21] As the court in *Redding* wrote:

> To prevent a chilling effect on free speech, the Supreme Court of Pennsylvania has held that "statements which represent differences of opinion or are annoying or embarrassing, are without more not libelous." *Bogash v. Elkins*, . . . 405 Pa. 437, 440, 176 A.2d 677, 679 (1962). Neither is a statement libelous which is "no more than rhetorical hyperbole" or "a vigorous epithet" used to describe what the publisher believes to be another's extremely unreasonable position. *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 . . . (1970).[22]

The *Redding* court, in view of these guiding postulates, determined that the challenged statement that the town supervisor's role evidenced a conflict of interest "'at the very least, and perhaps much more'" was a remark characterized by "the type of rhetorical hyperbole common to American politics," and as such it is protected by the First Amendment.[23] With regard to the only misstatement in the defendant's publication —namely, the assertion that the plaintiff's property was adjacent to, rather than near, the proposed building site—the *Redding* court noted that it is "minor," and moreover that it is incapable of bearing a defamatory meaning since it is analogous to the "rhetorical hyperbole" or "vigorous epithet" that commonly is heard in American public life.[24]

Additionally, while avowing that the defendant's comments dealt, at least in part, with factors motivating the plaintiff's actions, *Redding* emphasized that errors of fact about such matters are almost unavoidable. *Redding* embraced the comment in *Sweeney v. Patterson*[25]—which the Supreme Court also quoted with approval in *New York Times*—where it was stated that "(e)rrors of fact, particularly in regard to a man's mental states and processes, are inevitable . . .. Whatever is added to the field of libel is taken from the field of free debate."[26] *Redding* concluded that to hold that the questioned publications were capable of a defamatory meaning would unduly infringe upon "the field of free debate."[27]

On the basis of the analysis in *Redding*, which appears consistent with the precepts articulated by the Pennsylvania Supreme Court in *Bogash v. Elkins*, 405 Pa. 437, 176 A.2d 677, 678–79 (1962), and *Volomino v. Messenger Publishing Co.*, 410 Pa. 611, 189 A.2d 873, 874–75 (1963), we have concluded that the Pennsylvania courts would hold that the broadcast of concern

---

**21.** *Id.* at 881, *quoting New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964).

**22.** 296 A.2d at 881–82.

**23.** *Id.* at 882. *See Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970).

**24.** 296 A.2d at 882.

**25.** 76 U.S.App.D.C. 23, 128 F.2d 457 (1942).

**26.** *Id.* at 458, *quoted in New York Times Co. v. Sullivan*, 376 U.S. 254, 272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

**27.** 296 A.2d at 883.

here, in terms of both the specific statements in it as well as their innuendoes, is incapable of a defamatory meaning.

The only specific error in the program was a comment about Pierce's relationship with Ferenz, which suggested that the two men had a closer family tie than in fact they had—although there was some such connection.[28] That misstatement certainly is a minor matter in the context of the broadcast in its entirety. For the burden of the discussion of the relationship between the two men was that *some* interlocking connections existed among the individuals involved in Port Authority activities, not that any particular relationship obtained.[29]

Further, in response to Pierce's objection to the implications of some of the program's language that may be said to constitute hyperbole—such as the title, and the introductory remarks that the public should "hold onto your dollars" and that the reporter investigating the story pursued the "high speed road to profit"—it should be noted that such language would appear to fall squarely within the reach of the principles elaborated in *Redding*. Moreover, since *Redding* grants protection to the bald assertion of a conflict of interest, it would seem *a fortiori* that the Pennsylvania courts

would safeguard the statements about Pierce's land purchases, which are said by plaintiff only to carry the implication of a conflict of interest.[30]

Thus, under Pennsylvania law no defamation has occurred in the present situation.

### D.

But even if we have misconstrued the Pennsylvania law of defamation, the result in this appeal would not be altered. This is so since, even if the publication here were held to be actionable under state law, it nevertheless would be protected on constitutional grounds.[31]

Discussions by the Supreme Court of the constitutional privilege for defamatory speech about public officials have reflected a keen awareness that this area of the law entails a definite tension between two fundamental ideals, and that an accommodation between them must be struck in each case. On the one hand, our legal system recognizes the principle that an individual should be protected against incorrect statements which dishonor his name.[32] Indeed, "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Rosenblatt v. Baer*, 383 U.S. 75, 86, 86 S.Ct. 669, 676, 15 L.Ed.2d 597

**28.** *See* note 10 *supra.*

**29.** As the defendant has pointed out, Pierce on appeal appears to have dropped the suggestion that the statement about his relationship with Ferenz by itself is defamatory. Yet, because this is not clear from the record, it is necessary to deal with the matter.

**30.** Furthermore, given the breadth of the principles in *Redding*, it cannot be concluded that a Pennsylvania court would rule that the opinions expressed in the broadcast, such as by Bunting—to the effect that land purchases by Port Authority Commissioners are improper— are undeserving of First Amendment protection.

**31.** Although, as a general matter, when a case may be disposed of on nonconstitutional grounds, it is appropriate not to reach the constitutional issue, such a result in this case would be unduly insensitive to the important First Amendment values at stake here, and seems inconsistent with the approach of the

Supreme Court in the area of defamation. *Cf. Siler v. Louisiana & Nashville Ry. Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 455, 53 L.Ed. 753 (1909) ("Where a case in this court can be decided without reference to questions arising under the Federal Constitution, that course is usually pursued and is not departed from without important reasons.").

**32.** The individual's interest safeguarded by a state's law of defamation is a "relational" one, as it involves the opinion that members of a community have of a person and the impact on that opinion of an utterance by the defendant. *See* W. Prosser, *Law of Torts*, § 111, at p. 737 (4th ed. 1971). Defamation thus cannot occur when a statement is made in private that no third party is ever allowed to hear. Rather, "(a) communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Restatement, Second, Torts*, § 559 (1977).

(1966).[33] On the other hand, our courts must adhere to the notion, expressed in *New York Times* and the cases following it, that free expression about public matters on the part of citizens and the press must be zealously guarded.[34]

The foundation for an attempt to accommodate both of these precepts, of course, is the Supreme Court's elaboration in *New York Times* of the constitutional framework for defamation analysis. Prior to *New York Times*, the Supreme Court had announced in dicta that libelous words were not safeguarded by the Constitution.[35] The Court's approach was dramatically altered in 1964 by *New York Times* which, in the words of one commentator, "created an entirely new system of liability for defamation." [36]

In reversing a decision by the Alabama courts holding a publisher strictly liable for defamatory falsehoods in an advertisement soliciting funds for the civil rights movement,[37] *New York Times* took as its basic premise the central meaning of the First Amendment, which was said to be "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and

---

**33.** Cf. Shakespeare, *Othello*, III, iii, 155–61 (Iago) (A. Harbage ed., 1969).

Good name in man and woman, dear my lord,
Is the immediate jewel of their souls.
Who steals my purse steals trash; 'tis something, nothing;
'Twas mine, 'tis his, and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed.

**34.** *See New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). *See also* Robertson, *Defamation and the First Amendment: In Praise of Gertz v. Robert Welch, Inc.*, 54 Tex.L.Rev. 199, 200 (1976) ("*Gertz*, like all of the *New York Times* series of decisions, attempts to reconcile mutually irreconcilable values: the polity's interest in free and full interchange of potentially useful information and ideas, and the citizen's interest in freedom from destructive invasions of his reputation, relationships, and personality."); W. Prosser, *Law of Torts*, § 111, at 737 (4th ed. 1971) (the law of defamation ". . . is a curious compound of a strict liability imposed upon innocent defendants, as rigid and extreme as anything found in the law, with a blind and almost perverse refusal to compensate the plaintiff for real and very serious harm. *The explanation is* in part one of historical accident and survival, *in part one of the conflict of opposing ideas of policy in which our traditional notions of freedom of expression have collided violently with sympathy for the victim traduced and indignation at the maligning tongue.*" (emphasis supplied).)

**35.** *See Beauharnais v. Illinois*, 343 U.S. 250, 266, 72 S.Ct. 725, 96 L.Ed. 919 (1952). *See also Konigsberg v. State Bar of California*, 366 U.S. 36, 49 and n.10, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961); *Roth v. United States*, 354 U.S. 476, 486–87, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957);

*Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942); *Near v. Minnesota*, 283 U.S. 697, 715, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). *But see New York Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S.Ct. 710, 720, 11 L.Ed. 686 (1964) (". . . libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment."). For a review of the modern development of the American law of defamation, *see* Eaton, *The American Law of Defamation Through Gertz v. Robert Welch, Inc. and Beyond: An Analytical Primer*, 61 Va.L.Rev. 1349, 1359.

**36.** Anderson, *Libel and Press Self-Censorship*, 53 Tex.L.Rev. 422 (1975). *See* Kalven, *The New York Times Case: A Note on "The Central Meaning of the First Amendment,"* 1964 Sup.Ct.Rev. 191, 194 (". . . the opinion (*New York Times*) makes a notable shift in constitutional idiom . . ."). Cf. Note, *The First Amendment Overbreadth Doctrine*, 83 Harv.L.Rev. 844, 884–90 (1970) (viewing *New York Times* as an uncommon attempt by the Supreme Court to enunciate in the First Amendment area a determinate rule of privilege).

**37.** In *New York Times*, the Supreme Court reversed a libel judgment of $500,000 that had been awarded to the police Commissioner of Montgomery, Alabama, against four clergymen and the New York Times. The allegedly defamatory publication was a paid advertisement soliciting contributions for activities by civil rights activists in the South. The advertisement charged the police with brutality and harassment during racial disturbances. The police commissioner was not named in the advertisement, but was only linked to the assertions in it by virtue of his official position as supervisor of the police force.

sometimes unpleasantly sharp attacks on government and public officials."[38] The majority rejected the position, advocated by three concurring Justices,[39] that speech defaming public officials should be accorded absolute immunity.[40] Instead, the Court established for such speech a qualified privilege defeasible only on proof of "actual malice" on the part of a defendant.[41] "Actual malice" is not at all synonymous with common law malice, which includes spite or ill-will.[42] What is meant by the term in the defamation context is either that the defendant knew of the falsity of the communication in question or that he published the comment in reckless disregard of its truth or falsity.[43]

*New York Times* thus stands, *inter alia*, for the proposition that a calculated lie about a public official, or a statement uttered out of reckless inattention to its falsity, is beyond the pale of constitutional protection. *See Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). In laying down this standard, the Court took pains to guard against too sweeping a definition of actionable defamation. It stressed that, as a general matter, "erroneous. statement is inevitable in free debate,"[44] and that speakers or publishers, if exposed broadly to liability for defamation, might well engage in self-censorship. Such self-checking could be expected to follow as much from the threat of a sanction as from the actual enforcement of one,[45] for not

**38.** 376 U.S. at 270, 84 S.Ct. at 721. *See id.* at 275, 84 S.Ct. at 723 (quoting Madison's statement, "If we advert to the nature of Republican Government, we shall find that the censorial power is in the people over the Government, and not in the Government over the people."). *See also* Kalven, *The New York Times Case: A Note On "The Central Meaning of the First Amendment,"* 1964 *Sup.Ct.Rev.* 191, 208–09. *See generally* J. Miller, *Crisis In Freedom: The Alien and Sedition Acts* (1951); Brant, *Seditious Libel: Myth and Reality*, 39 *N.Y.U.L.Rev.* 1 (1964).

**39.** Justices Black, Douglas and Goldberg urged that there should be a rule of absolute immunity for speech defaming public officials. *See* 376 U.S. at 293, 84 S.Ct. at 733 (Black, J., concurring), 297, 84 S.Ct. at 735 (Goldberg, J., concurring in result). Justice Douglas joined both concurring opinions.

**40.** *Cf. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974) (a rule of absolute immunity "would, indeed, obviate the fear that the prospect of civil liability for injurious falsehood might dissuade a timorous press from the effective exercise of First Amendment freedoms. Yet absolute protection for the communications media requires a total sacrifice of the competing value served by the law of defamation.").

**41.** A plaintiff must prove "actual malice" with "convincing clarity." *See New York Times Co. v. Sullivan*, 376 U.S. at 285–86, 84 S.Ct. at 729 ("[W]e consider that the proof presented to show actual malice lacks the convincing clarity which the constitutional standard demands . . ."). *See also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

**42.** *See Garrison v. Louisiana*, 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964) ("Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth."). *See also* L. Tribe, *American Constitutional Law* § 12–12, at 634–35 n.21 (1978).

**43.** *See* 376 U.S. at 279–80, 84 S.Ct. at 726 (a public official is prohibited from recovering damages for a defamatory publication bearing on his official conduct "unless he proves that the statement was made with 'actual malice'— that is, with knowledge that it was false or with reckless disregard of whether it was false or not.").

There can be little doubt that a certain confusion has arisen as a result of the use of the term "actual malice" in referring both to knowing as well as to reckless disregard of falsity. Nevertheless, the use of the term in legal literature and defamation decisions has persisted. Thus, in this opinion, following *New York Times*, the phrase is utilized as a short-hand expression for knowing or reckless inattention to the falsity of a publication.

**44.** *Id.* at 271, 84 S.Ct. at 721. *See also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789 (1974) ("The First Amendment requires that we protect some falsehood in order to protect speech that matters.").

**45.** *See* L. Tribe, *American Constitutional Law* § 12–12, at 634 (1978); Anderson, *Libel and Press Self-Censorship*, 53 *Tex.L.Rev.* 422, 424–26, 430–34 (1975) (emphasizing the considerable financial cost of defending defamation suits).

only is it frequently difficult to prove the truth of a defamatory communication,[46] but also the risk incurred in attempting to establish truth before fallible juries or judges is considerable.[47] Consequently, *New York Times* determined not to shield speech about public officials merely on a case-by-case basis, but rather to enunciate a general protective principle designed to leave room for courts to guard the individual against malicious attacks on his reputation and, at the same time, to prevent undue "chilling effects" on such expression.[48]

The meaning of the Supreme Court's "actual malice" requirement was amplified in *Garrison v. Louisiana*,[49] where the Court distinguished between an "honest utterance, even if inaccurate," which is to be constitutionally safeguarded, and the "use of calculated falsehood," which is not.[50] The knowing and deliberate lie about a public official is not accorded First Amendment protection, the Court in *Garrison* indicated, because it is "at odds" with the norms of a democratic polity and with the requisites of "orderly" social, political and economic change.[51] *Garrison* invoked as

support for this idea the dictum in *Chaplinsky v. New Hampshire*[52] that certain types of utterances, such as a conscious prevarication about a public official, "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."[53]

■ In the present case, as has been noted, the only falsity identified in the broadcast is a statement regarding Pierce's relationship with Ferenz. However, as to this remark, there is no indication that any calculation or deliberateness on the defendants' part entered into the act of publication. Because there was a basis on which Kellman could have reasonably believed that Pierce was Ferenz' brother-in-law,[54] the comment is most properly understood as an "honest utterance, even if inaccurate," and therefore as constitutionally protected.

Further, the Supreme Court has made it clear that the "recklessness" component of "actual malice" cannot be inferred simply from the failure to act in conformity with

46. Truth, of course, is a defense to a charge of defamation. *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 489–90 (1975); *Restatement, Second, Torts*, § 581A (1977); W. Prosser, *Law of Torts* § 116, at 796–99 (4th ed. 1971). *See also* Keeton, *Defamation and Freedom of the Press*, 54 *Tex.L.Rev.* 1221, 1241–45 (1976).

47. *See* Kalven, *The New York Times Case: A Note on "The Central Meaning of the First Amendment,"* 1964 *Sup.Ct.Rev.* 191, 212.

48. *Cf. Dombrowski v. Pfister*, 380 U.S. 479, 489, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965). *See also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 343–44, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974) (to scrutinize and weigh the competing interests in every libel case "would lead to unpredictable results and uncertain expectations, and it could render our duty to supervise the lower courts unmanageable. . . . [W]e must lay down broad rules of general application.").

49. 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 25 (1964). In *Garrison*, the Court held that the rule of *New York Times* limits state power to impose criminal sanctions for criticizing the official conduct of public officers.

50. *Id.* at 75, 85 S.Ct. 209.

51. *Id. Cf.* Brennan, *The Supreme Court and the Meiklejohn Interpretation of the First Amendment*, 79 *Harv.L.Rev.* 1, 18–19 (1965) ("[T]he *New York Times* principle has an important qualification; it does not bar civil or criminal libel actions for false criticism of the official conduct of a public official if that criticism is made with knowledge of its falsity or in reckless disregard of whether it was false or true. The underpinning of that qualification is the 'redeeming social value' test."). *See also Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117 (1931) ("The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system.").

52. 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), *quoted in Garrison v. Louisiana*, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

53. 315 U.S. at 572, 62 S.Ct. at 769.

54. *See* note 11 *supra*.

the conduct of a prudent or reasonable person. In *New York Times* itself, the Court held that the plaintiff did not satisfy his burden of proof because the record did not demonstrate that the publisher was aware of the likelihood that he was circulating false information. That was the case even though it might have been negligent not to have checked the accuracy of the copy of the advertisement against stories in the newspaper's own files.[55] And in *St. Amant v. Thompson*,[56] the Court emphasized that in order to establish "actual malice", one must show more than negligence:

> . . . reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. *There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.* (emphasis supplied) [57]

Consequently, in determining whether a defendant has been reckless, the operative inquiry is whether he published the statement even though he "in fact entertained serious doubts as to the truth of his publication." [58]

There is no indication in the present record, that the defendants "entertained serious doubts" about the truth of any remark

in the broadcast. As defendants have pointed out, the Kellman memoranda and the other materials adduced during discovery on which Pierce seeks to rely do *not* demonstrate that they knew that utterances in the broadcast were of questionable validity. To the contrary, these memoranda establish that they considered whether to charge Pierce—and Cornell—with utilizing insider information for private gain, and decided on the basis of the data before them not to do so.[59]

■ Moreover, the publication of "hyperbole," even if caustic and irritating, cannot by itself support the inference that the publisher evidenced "actual malice". In *Greenbelt Cooperative Publishing Assn. v. Bresler*,[60] the plaintiff complained that he had been defamed by statements reported in defendant's newspaper which charged him with "blackmail." [61] Notwithstanding the use of such an inflammatory term, the Supreme Court held that "as a matter of Constitutional law, the reference to 'blackmail' in these circumstances was not slander when spoken, and not libel when reported" in the newspaper. The rationale for this result was that "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered Bresler's negotiating position extremely unreasonable." The Court refused to permit the imposition of liability on the

---

**55.** *See* 376 U.S. at 287–88, 84 S.Ct. at 730 ("We think the evidence against the Times supports at most a finding of negligence in failing to discover the misstatements . . .").

**56.** 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968).

**57.** *Id.* at 731, 88 S.Ct. at 1325.

**58.** The Supreme Court in *St. Amant* explicitly recognized that the emphasis on a defendant's subjective doubt under the standard of knowing or reckless publication of falsity might be said to encourage publishers not to investigate the accuracy of defamatory statements, but concluded that this was an acceptable side-effect—to the extent it exists—in the context of public debate on public issues. *See* 390 U.S. at 731–32, 88 S.Ct. at 1325. For the point that reckless disregard of falsity requires a high degree of subjective awareness of falsity, *see*

*also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 332, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

**59.** At most, on the facts here, it might be said that the defendants acted carelessly or negligently. But this alone, quite plainly is not enough. For ". . . the stake of the people in public business and the conduct of public officials is so great that neither the defense of truth nor the standard of ordinary care would protect against self-censorship and thus adequately implement First Amendment policies." *St. Amant v. Thompson*, 390 U.S. 727, 731–32, 88 S.Ct. 1323, 1326, 20 L.Ed. 262 (1968).

**60.** 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970).

**61.** *Id.* at 7–8, 90 S.Ct. 1537. In *Greenbelt*, the relevant state law made blackmail a crime.

newspaper in such circumstances because it would "subvert the most fundamental meaning of a free press, protected by the First and Fourteenth Amendments." [62]

It appears that, in the situation under consideration, some of the statements in the program's introduction as well as its title would be construed by a reasonable television viewer as being essentially historical comment or hyperbole. As such, they must be accorded the full measure of constitutional protection mandated by *Greenbelt*. [63]

The further claim by Pierce is that "actual malice" may be inferred from the fact that the defendants published remarks giving the impression, without saying so explicitly, that he was engaged in a pattern of using insider knowledge for private gain through real estate transactions—even though, in fact, he had purchased the land in question after leaving public office. That argument, by its own terms, concedes that no specific statement about the land transactions was incorrect. It rather rests upon the notion that "actual malice" is established by the fact that the defendants failed to rule out the possibility that Pierce used insider knowledge when buying land whose value was affected by decisions of the public agency on which he sat.

Pierce's contention thus hinges primarily on the *negative* implications said to flow from the program's treatment of his ownership of the three plots of land. Regarding the first parcel, however, as has been noted, the broadcast did provide the correct time sequence of Pierce's membership on the Port Authority and his later purchase of the real estate. In light of the fact that the

publication was literally correct, it cannot fairly be said that, from the discussion about the land near the Commodore Barry Bridge, one may infer "actual malice" on the part of the defendants.

Mere lack of a statement of such time sequence as to the other two parcels of land in which Pierce had an interest cannot be held to establish the existence of "actual malice" on the defendants' part. For the remarks about Pierce's interests in the real estate on Ferry Avenue and in Woodbury explicitly included the phrase "*former* Camden Mayor and Port Authority Chairman." (emphasis supplied) We cannot agree with the plaintiff's suggestion that "actual malice" is demonstrated simply by the fact that the modifier "former" was not placed before the title "Port Authority Chairman," but was situated before "Camden Mayor." Although there is arguably some ambiguity in the program regarding Pierce's membership on the Port Authority at the time of the real estate transactions, that alone, in our view, does not suffice to sustain the burden of establishing with convincing clarity knowing or reckless disregard of falsity. [64]

Beyond the details relating to the various statements in the broadcast are fundamental principles of First Amendment jurisprudence compelling the conclusion that no actionable defamation occurred here. Since Pierce was a public official and did have, or at least appeared to the public to have, "substantial responsibility for or control over the conduct of governmental af-

---

62. *Id.* at 14, 90 S.Ct. at 1542. Thus, the Supreme Court in *Greenbelt* flatly rejected the contention that, by reporting comments including the word "blackmail"—which the defendants were said to have known was a crime that Bresler had not committed—defendants could be held liable for knowing or reckless disregard of falsity.

63. At oral argument, counsel for Pierce suggested that it is inappropriate to employ the term "hyperbole" in the context of a television broadcast which purported, at least in part, to be a documentary program relating to issues of public concern. Yet, not only is the application

of the principle of *Greenbelt* not limited in such a manner, but also its logic would appear to compel a broader rendering of it than Pierce's counsel would allow.

64. It is also implausible to say that the defendants' "actual malice" with respect to Pierce may be inferred from the fact that the television program included a comment by Bunting that buying land as a Port Authority Commissioner is questionable behavior. This is apparently an accurate portrayal of a citizen's views about an issue of public importance, and nowhere does the comment make reference to any particular individual.

fairs," [65] his claim lies within the heartland of defamation actions covered by *New York Times*. In addition, there is no doubt that the remarks in the telecast about Pierce were pertinent to his official conduct, for "anything which might touch on an official's fitness for office is relevant." [66] The fact that the program was not shown until after Pierce was out of office does not undermine these points.[67] Consequently, the strong First Amendment policy of protecting the free flow of ideas about public officials and their activities—even when some vehement or unpleasantly sharp comments may be involved—is fully operative.

In view of these circumstances, and because the media such as are involved in this case personify the First Amendment values in the free exchange of ideas and open debate about public officials,[68] the publication challenged by Pierce should be protected by the First Amendment. Any other conclusion would have "disquieting implications for criticism of governmental conduct," [69] for it would likely lead to the kind of chilling effect on the media that *New York Times* and its successors directly seek to avoid.[70]

### E.

Thus, under Pennsylvania law as well as under federal constitutional standards, there is no basis for holding that the district court erred in granting the defendants' motion for summary judgment. Consequently, the court's judgment will be affirmed.

**65.** *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S.Ct. 669, 676, 15 L.Ed.2d 597 (1966).

**66.** *Garrison v. Louisiana*, 379 U.S. 64, 77, 85 S.Ct. 209, 217, 13 L.Ed.2d 125 (1964).

**67.** The television program was in large part about decisions made at the time that Pierce was in office, and thus his official role was directly relevant. The passage of some three years between the time of Pierce's departure from the Port Authority and the airing of the broadcast did not, by itself, strip Pierce of his status as a "public official" for purposes of analyzing this case. *Cf. Time, Inc. v. Johnston*, 448 F.2d 378, 381 (4th Cir. 1971) ("[M]ere passage of time will not necessarily insulate from the application of *New York Times Co. v. Sullivan*, publications relating to the past public conduct of a then 'public figure.' No rule of repose exists to inhibit speech relating to the public career of a public figure so long as newsworthiness and public interest attach to events in such public career."). See also Bamberger, *Public Figures and the Law of Libel: A Concept in Search of a Definition*, 33 *Bus.Law.* 709, 723–24 (1978). It should be noted also that Pierce never suggested that he is not a public official in the context of the present appeal.

**68.** *Cf.* Robertson, *Defamation and the First Amendment: In Praise of Gertz v. Robert Welch, Inc.*, 54 *Tex.L.Rev.* 199, 218–19 (1976), quoting Justice Stewart, *"Or of the Press"*, 26 *Hastings L.J.* 631, 634 (1975):

> [A] free press was not just a neutral vehicle for the balanced discussion of diverse ideas. Instead, the free press meant organized, expert scrutiny of government. The press was a conspiracy of the intellect, with the courage of numbers. This formidable check on official power was what the British Crown had feared—*and what the American founders decided to risk.* (emphasis supplied)

**69.** *New York Times Co. v. Sullivan*, 376 U.S. 254, 291, 84 S.Ct. 710, 732, 11 L.Ed.2d 686 (1964).

**70.** The constitutional privilege enunciated in *New York Times* should not be conceived of by the media as a justification for careless reporting. Nonetheless, we must decide the issues put to us under the law as articulated first by the Pennsylvania courts and then by the Supreme Court, and in light of that and our review of the record, we have concluded that no recovery is warranted here. *See New York Times*, 376 U.S. at 285 & n.26, 84 S.Ct. 710. *See also Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248 (1967) ("[W]e have undertaken an independent examination of the record as a whole 'so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression.' ").