Carson Wayne NEWTON, aka: Wayne Newton, Plaintiff–Appellee,

v.

NATIONAL BROADCASTING COMPANY, INC.; Brian Elliot Ross; Ira Silverman; Paul Greenberg, et al., Defendants–Appellants.

Carson Wayne NEWTON, aka: Wayne Newton, Plaintiff–Cross–Appellant,

v.

NATIONAL BROADCASTING COMPANY, INC.; Brian Elliot Ross; Ira Silverman; Paul Greenberg, et al., Defendants–Cross–Appellees.

Nos. 89–55220, 89–55285.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 13, 1990.

Decided Aug. 30, 1990.

As Amended on Denial of Rehearing and Rehearing En Banc April 5, 1991.

Floyd Abrams, Ira J. Dembrow, Albert Robbins, Cahill Gordon & Reindel, New York City, and Robert S. Warren, Rex S. Heinke, Kelli L. Sager, Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendants-appellants and defendants-cross-appellees.

Morton R. Galane, Thomas J. Tanksley and Philip M. Ballif, Las Vegas, Nev., for plaintiff-appellee and plaintiff-cross-appellant.

P. Cameron DeVore, Davis Wright & Jones, Seattle, Wash., Sam Antar, Capital Cities, ABC, Inc., Douglas P. Jacobs, CBS, Inc., and Muriel Henle Reis, Fox Television Stations, Inc., New York City, for amici curiae.

Before GOODWIN, Chief Judge, NELSON and NORRIS, Circuit Judges.

WILLIAM A. NORRIS, Circuit Judge:

In the Report on the Virginia Resolutions of 1798, James Madison wrote:

> In every state, probably, in the Union, the press has exerted a freedom in canvassing the merits and measures of public men, of every description, which has not been confined to the strict limits of the common law. On this footing, the freedom of the press has stood; on this foundation it yet stands....

4 Elliot's Debates on the Federal Constitution 570 (1876). In *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), the Supreme Court secured for the press the ability to write and publish freely without risking vindictive reprisals from local juries. The Court in *New York Times* adopted as a constitutional rule the requirement that appellate courts independently review jury findings of "actual malice" in public figure defamation cases. There, the rule of independent review was applied to set aside a verdict of an all-white Alabama jury against a New York newspaper and several black civil rights leaders in favor of the local Commissioner of Public Affairs. Here, we consider the largest punitive damages verdict in American libel history returned against a different New York news organization by a Las Vegas jury in favor of a hometown hero. We must decide the extent to which the rule of independent review in *New York Times* and its progeny requires us to depart from the traditional rule of deference to the fact-finding function of the jury. Just as the Supreme Court struggled in *Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) and *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) to strike the proper balance between our constitutional (Seventh Amendment) deference to the factfinder and our constitutional duty to safeguard First Amendment values, we now face the daunting task of reconciling our duty to respect the jury's fact-finding role with our duty to protect the values enshrined in the First Amendment.

On October 6, 1980, National Broadcasting Company, Inc. (NBC) broadcast on television a three and one-half minute story called "Wayne Newton and the Law" on the NBC Nightly News. Relevant excerpts from the script of that story read as follows:

> ... [Guido] Penosi is a New York hoodlum from the Gambino Mafia family, a man with a long criminal record, now believed to be the Gambino family's man on the West Coast, in the narcotics business, and also in show business. Penosi is also a key figure in a federal grand jury investigation ... that involves one of the big casinos here [Las Vegas], the Aladdin; and one of Las Vegas's top performers, singer Wayne Newton. Newton is said to make a quarter of a million dollars a week for his nightclub act, and late last week, Newton and a partner were given state approval to buy the Aladdin Hotel in Las Vegas for 85 million dollars. A federal grand jury is now investigating the role of Guido Penosi and the mob in Newton's deal for the Aladdin. Despite his big income, authorities say Newton has had financial problems. Investigators say that last year, just before Newton announced he would buy the Aladdin, Newton called Guido Penosi for help with a problem. Investigators say whatever the problem was, it was important enough for Penosi to take it up with leaders of the Gambino family in New York. Police in New York say that this mob boss, Frank Piccolo, told associates that he had taken care of Newton's problem and had become a hidden partner in the Aladdin hotel deal. At a hearing of the State Gaming Board, Wayne Newton said he had no hidden partners, and Newton said under oath that he knew Guido Penosi ... but that Penosi was just a long-time family friend.

> .   .   .   .   .

> Federal authorities say that Newton is not telling the whole story, and that Newton is expected to be one of the first witnesses in the grand jury investigation. Newton became angry when we tried to talk to him about his relationship with Guido Penosi.

> .   .   .   .   .

> Guido Penosi told us he doesn't know anyone named Wayne Newton. Federal authorities say they know of at least 11 phone calls Penosi made to Newton's house in one two-month period, and authorities say those phone calls and Penosi's relationship with Newton and other entertainment figures are now part of a broad year-long FBI investigation of the

investment of East Coast mob money from narcotics and racketeering into the entertainment business in Las Vegas and Hollywood.[1]

On April 10, 1981 appellant Carson Wayne Newton filed a defamation action against NBC and three of its journalists: Brian Ross, the reporter, Ira Silverman, the field producer, and Paul Greenberg, the executive producer. Newton claimed that the October 6 broadcast, and two subsequent broadcasts concerning the grand jury investigation and indictment, either falsely stated or conveyed the false impression that "the Mafia and mob sources" helped Newton buy the Aladdin in exchange for a hidden share of the hotel/casino and that Newton, while under oath, deceived Nevada state gaming authorities about his relationship with the Mafia.[2]

Discovery proceedings commenced in Las Vegas, the venue in which Newton had filed his complaint. When discovery was completed, NBC moved for summary judgment and a change of venue from Las Vegas. The district court denied summary judgment on the ground that the jury could find that the NBC broadcasts left a false and defamatory impression about Newton, notwithstanding the fact that NBC had "made a substantial and persuasive showing that each of the statements made are either true or protected under the common law privilege of fair reporting." ER at 160. The district court also denied the motion for a change of venue.

Following a 37–day trial, the jury returned a special verdict, finding all four defendants liable for defaming Newton. The jury explicitly found that at least one statement and one impression about Newton conveyed by one or more of the three broadcasts was defamatory, of a factual nature, and was false.[3] The jury also found that two of the three NBC journalists had made a false and defamatory statement with knowledge of falsity or with serious subjective doubts about the statement's truth or accuracy and that all three individual defendants intended to convey a false or defamatory impression about Newton with knowledge of falsity or serious subjective doubt about the truth of the impression. The district court, in considering NBC's motion for judgment notwithstanding the verdict, discussed only what it considered to be the false impression created by the broadcasts. *Newton v. National Broadcasting Co., Inc.*, 677 F.Supp. 1066, 1067 (D.Nev.1987) ("The clear and inescapable impression made by the broadcasts was that [Newton] did not have enough money to buy the Aladdin Hotel so he called a friend, Guido Penosi, who had ties to organized crime; and that Mr. Penosi helped him raise the money and thus obtained a hidden interest in the Aladdin Hotel").

The jury awarded Newton more than $19 million in compensatory and punitive damages, to which prejudgment interest of approximately $3.5 million was added. In response to NBC's motion for judgment notwithstanding the verdict and in the alternative for a new trial, the district court

---

**1.** Excerpts of Record (ER) at 43–47.

**2.** The trial judge in the jury instructions described the following impressions possibly conveyed by NBC's broadcasts:

1. Financing of Wayne Newton's acquisition of his interest in the Aladdin Hotel and Casino, Las Vegas, Nevada, was obtained by and through [m]afia and mob sources, and Wayne Newton holds a hidden ownership in said Aladdin Hotel and Casino for the benefit of said Mafia and mob sources.

2. Wayne Newton has not truthfully related to Nevada gaming authorities the facts of his relationship with Guido Penosi and Wayne Newton is associated with Guido Penosi who is involved in both narcotics business [sic] and show business on the west coast;

3. Visually depicts Wayne Newton testifying, under oath, before the Nevada gaming authorities and in connection with said testimony, states that Federal authorities say Newton is not telling the whole story.

Appellee's Supplemental Excerpt of Record (SER) at 231–32.

**3.** Special Verdict Question 4A asked the jury "[H]as Mr. Newton proved by clear and convincing evidence that any false and defamatory statement of a factual nature about him was stated in one or more of the three broadcasts complained of with knowledge of falsity or with serious subjective doubt about its truth on the part of any of the defendants?" SER at 251.

upheld the jury's verdict of liability and its awards of damages for pain and suffering and punitive damages. It set aside the verdict on the jury's award of $9,046,750 for Newton's claims of lost past and future income, ruling that Newton "failed to establish by a preponderance of the evidence that the broadcasts in question had any causal connection to any alleged loss of past or future income...." *Id.* at 1069.

■ The district court also set aside the jury's award of $5 million for damage to Newton's reputation, concluding that the award "shocks the conscience of the court because the broadcasts did not tarnish [Newton's] outstanding reputation." *Id.* at 1068. The court directed Newton to file a remittitur of all sums except $225,000 for physical and mental injury, $50,000 as presumed damages to reputation, and $5 million in punitive damages or there would be a new trial on all issues. In addition to ordering a new trial if the remittitur were not filed, the district court ruled that the interests of justice required that the new trial be held in the Central District of California. *Id.* at 1069. Put to the choice of a new trial outside Las Vegas or filing the

remittitur, Newton filed the remittitur.[4] Final judgment for $5,275,000 was entered on February 10, 1989. This timely appeal followed.

■ The issue of actual malice disposes of this appeal.[5] Newton now concedes that he is a "public figure" as that term is defined in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 345, 94 S.Ct. 2997, 3008, 3009, 41 L.Ed.2d 789 (1974) for purposes of this case [6] and therefore the First Amendment, as interpreted in *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964), precludes recovery unless Newton proved at trial by clear and convincing evidence that NBC and its journalists made a false, disparaging statement with "actual malice."

■ Actual malice consistently has been deemed subjective in nature, provable only by evidence that the defendant "realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose*, 466 U.S. at 511 n. 30, 104 S.Ct. at 1965 n. 30; *see also Harte–Hanks*, 109 S.Ct. at 2685; *Hustler Magazine v. Falwell*, 485 U.S. 46,

---

4. This partial grant of judgment notwithstanding the verdict is the subject of a cross appeal by Newton. Newton asks us to reinstate the verdict of the jury on his claims of lost past and future income notwithstanding the fact that he accepted a remittitur and judgment was entered on the reduced award. NBC filed a motion to dismiss Newton's cross-appeal in which it contends that Newton may not attack the district court's reduction of damages because he has filed a remittitur. NBC's argument is persuasive. It is well settled that "a plaintiff in federal court ... may not appeal from a remittitur order he has accepted." *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 650, 97 S.Ct. 835, 837, 51 L.Ed.2d 112 (1977) (per curiam). This rule applies to cross-appeals. *999 v. C.I.T. Corp.*, 776 F.2d 866, 873 (9th Cir.1985) ("the rule in this circuit long has been that the plaintiff cannot contest the validity of a remittitur to which he has consented, even on cross-appeal"). Although our circuit has never addressed the question of an appeal from a portion of a remittitur order to which a party has agreed on a single cause of action, courts in other jurisdictions have rejected such attempted appeals. *E.g., Lanier v. Sallas*, 777 F.2d 321, 326 (5th Cir.1985) (where appeal is sought from the trial court's refusal to instruct the jury as to punitive damages on a single claim, and a remittitur has been

filed as to another aspect of damages on that same claim, "acceptance of the remittitur must put an end to the litigation").

5. Appellant NBC raises a myriad of issues in this appeal. NBC questions whether liability for defamation based on a false impression, as opposed to a false statement, may be imposed without contravening the First Amendment. NBC also asks us to consider whether the district court impermissibly allowed the jury to determine which statements in the broadcasts were ones of fact and not opinion and whether the district court violated provisions of the Jury Selection and Service Act in the selection of the jury. Appellant challenges the district court's denial of its motion for a change of venue and also raises numerous challenges to the computation of damages, including an attack on the law of our circuit regarding punitive damages in a First Amendment case. Because the actual malice issue disposes of this case in its entirety, we reach none of these questions.

6. Newton strongly contested his public-figure status before the district court. The district court held Newton to be a public figure and imposed sanctions of $55,000 on Newton for requiring his public figure status to be proved.

108 S.Ct. 876, 880, 99 L.Ed.2d 41 (1988); *see also St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968); *New York Times*, 376 U.S. at 279–80, 84 S.Ct. at 725–26. Even an extreme departure from accepted professional standards of journalism will not suffice to establish actual malice; nor will any other departure from reasonably prudent conduct, including the failure to investigate before publishing. Only the existence of "sufficient evidence to permit the conclusion that the defendant actually had a 'high degree of awareness of ... probable falsity'" will suffice to meet the subjective test. *Harte–Hanks*, 109 S.Ct. at 2696 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964)).

In this opinion, we assume, without deciding, that the broadcasts spoke in terms of fact, rather than opinion, and that at least one of these factual statements was false.[7] *See supra* at 666–667; *see also* Special Verdict 4A, SER251. We therefore review only the jury determination that NBC and three of its journalists acted with actual malice. After reviewing the evidence with the searching care required to protect First Amendment values, we conclude that Newton has failed to prove actual malice with "convincing clarity." *Bose*, 466 U.S. at 511, 104 S.Ct. at 1965.

## II

We first consider the appropriate standard of appellate review of a jury's finding of actual malice. In reviewing the evidentiary record before us, we are particularly concerned about when and to what degree our responsibility under *New York Times* to review the record independently requires us to depart from the special deference with which we would normally treat each and every one of a jury's factual determinations.[8] As Justice Stevens noted in *Bose*, 466 U.S. at 498, 104 S.Ct. at 1958, the independent review standard and the clearly erroneous standard of Rule 52(a) "point in opposite directions." As we consider the direction in which we should proceed, our compass is the Supreme Court's decisions in *New York Times*, *Bose* and *Harte–Hanks*.

■ In *New York Times*, the Supreme Court established the constitutional rule that a public figure such as Wayne Newton cannot recover damages for defamation without clear and convincing proof[9] that a

---

7. There is some conflict among the circuits as to whether the element of falsity must be established by clear and convincing evidence or by a preponderance of the evidence. *Harte–Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S.Ct. 2678, 2682 n. 2, 105 L.Ed.2d 562 (1989) (comparing *Firestone v. Time, Inc.*, 460 F.2d 712, 722–23 (5th Cir.) (Bell, J., specially concurring), *cert. denied*, 409 U.S. 875, 93 S.Ct. 120, 34 L.Ed.2d 127 (1972) with *Goldwater v. Ginzburg*, 414 F.2d 324, 341 (2d Cir.1969), *cert. denied*, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970)). The *Harte–Hanks* court explicitly refused to consider this issue. 109 S.Ct. at 2682 n. 2.

The standard of review for the falsity element is also unresolved. The Court of Appeals in *Harte–Hanks* reviewed the jury's determinations of the operational facts bearing on falsity under the clearly erroneous standard of Rule 52(a). *Id.* at 2683 n. 4 (quoting *Connaughton v. Harte Hanks Communications, Inc.*, 842 F.2d 825, 841 (6th Cir.1988)). The District of Columbia Circuit has held that whether speech is capable of defamatory meaning, however, is a question of law for the court. *See Tavoulareas v. Piro*, 817 F.2d 762, 779–80 (D.C.Cir.) (en banc), *cert. denied*, 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151

(1987). *See also* Restatement (Second) of Torts § 614(i), at 311 (1977).

8. Federal Rule of Civil Procedure 52(a) provides:

Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of witnesses.

Appellate courts accord the same deference to the fact-finding function of the jury that Rule 52(a) mandates for trial courts. For example, in *Harte–Hanks*, the Supreme Court applied Rule 52(a) principles to its review of the credibility determinations of a jury. 109 S.Ct. at 2696–97.

9. The Supreme Court has recently noted that the "clear and convincing" standard of proof is a higher standard which reflects a societal judgment about the greater importance of particular types of adjudication. *Cruzan v. Director, Missouri Department of Health*, —— U.S. ——, ——, 110 S.Ct. 2841, 2853–54, 111 L.Ed.2d 224 (1990). "The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree of confi-

false "statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279–80, 84 S.Ct. at 726. The Supreme Court also mandated that in public figure defamation cases, we must " 'make an independent examination of the whole record' so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." [10] *Id.* at 285, 84 S.Ct. at 729 (quoting *Edwards v. South Carolina,* 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963)). The requirement of independent appellate review established in *New York Times,* 376 U.S. at 285, 84 S.Ct. at 728, is a rule of federal constitutional law which "reflects" a deeply held conviction that judges ... must exercise such review in order to preserve the precious liberties established and ordained by the Constitution. *Bose,* 466 U.S. at 510–11, 104 S.Ct. at 1965. Thus, "[t]he question whether the evidence in the record ... is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact." [11] *Id.* Rather, we must simultaneously ensure the appropriate appellate protection of First Amendment values and still defer to the findings of the trier of fact.

■ The rule of independent review assigns judges a constitutional duty that cannot be delegated to the trier of fact; how-

ever, "it is not actually necessary to review the 'entire' record to fulfill the function of independent appellate review on the actual malice question...." *Id.* at 514 n. 31, 104 S.Ct. at 1967 n. 31. The Supreme Court has stressed that the rule "is law in its purest form" under the Constitution and our common-law heritage. *Bose,* 466 U.S. at 510–511, 104 S.Ct. at 1965. *See also New York Times,* 376 U.S. at 285, 84 S.Ct. at 728. Under the rule of independent review, we may accept all the purely factual findings of the district court and nevertheless hold as a matter of law that the record does not contain clear and convincing evidence that the NBC journalists prepared the October 6 broadcast with knowledge that it contained a false statement or with reckless disregard of the truth.

■ Although the clearly erroneous standard of Rule 52(a) requires us to defer to the jury's or trial court's factual findings, "the presumption of correctness that attaches to factual findings is stronger in some cases than in others." *Bose,* 466 U.S. at 500, 104 S.Ct. at 1959. Thus, although we generally review all purely factual findings for clear error, *see United States v. United States Gypsum Co.,* 333 U.S. 364, 394–96, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948), when we review evidence on the dispositive constitutional issue of actual malice, we are required to be more discriminating in our deference.[12] The presump-

---

dence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.' " *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (quoting *In re Winship,* 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)).

**10.** This independent examination of the record is "not equivalent to a 'de novo' review of the ultimate judgment itself." *Bose,* 466 U.S. at 514 n. 31, 104 S.Ct. at 1967 n. 31. In de novo review, the reviewing court makes an original appraisal of all the evidence to decide whether or not judgment should be entered for the plaintiff. *Id.* As a general rule, we have conducted a de novo review of the record when the district court has held a restriction on speech to be constitutional. *Daily Herald Co. v. Munro,* 838 F.2d 380, 383 (9th Cir.1988).

**11.** We note that the rule of independent review applies regardless of whether the factfinder is a

jury or a trial judge. *Bose,* 466 U.S. at 501, 104 S.Ct. at 1959 (responsibility of independent review "cannot be delegated to the trier of fact, whether the factfinding function be performed ... by a jury or by a trial judge"). *See also id.* at 509 n. 27, 104 S.Ct. at 1964 n. 27 ("The intermingling of law and fact in the actual-malice determination is no greater in state or federal jury trials than in federal bench trials").

**12.** Our independent review of actual malice has a peculiar twist. Actual malice involves a subjective analysis in which the trier of fact and the reviewing court discern the state of mind of the defamation defendant. A state of mind issue such as actual motive is a "pure question of fact" normally subjected to review under the "clearly erroneous" standard. *Pullman–Standard v. Swint,* 456 U.S. 273, 289, 102 S.Ct. 1781, 1790, 72 L.Ed.2d 66 (1982). *See also United States v. McConney,* 728 F.2d 1195, 1203 (9th

tion of correctness carries its maximum force when we review findings of fact that turn on credibility determinations because of the factfinder's unique " 'opportunity to observe the demeanor of the witnesses.' " *Harte–Hanks,* 109 S.Ct. at 2696 (quoting *Bose,* 466 U.S. at 499–500, 104 S.Ct. at 1959). On the other hand, the presumption applies with less force when a factfinder's findings rely on its weighing of evidence and drawing of inferences.[13]

■ But even when we accord credibility determinations the special deference to which they are entitled, we must nevertheless " 'examine for ourselves' " the factual record in full. *New York Times,* 376 U.S. at 285, 84 S.Ct. at 728 (quoting *Pennekamp v. Florida,* 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946). *See Harte–Hanks,* 109 S.Ct. at 2695. In sum, we read *Bose* and *Harte–Hanks* as creating a "credibility exception" to the *New York Times* rule of independent review. However, a determination of actual malice cannot be predicated on the factfinder's negative assessment of the speaker's credibility at trial. Although discredited testimony "does not rebut any inference of actual malice that the record otherwise supports, ... it is equally clear that it does not constitute clear and convincing evidence of actual malice." *Bose,* 466 U.S. at 512, 104 S.Ct. at 1966.

■ Finally, we must evaluate the nature of Rule 52(a)'s restriction upon our independent review of jury credibility determinations in light of the fundamental First Amendment values at stake in public figure defamation cases. In *New York Times,* the case in which the Supreme Court mandated heightened appellate review of actual malice determinations, the Court was obviously concerned about its constitutional responsibility to protect First Amendment values from the prejudices of local juries against alien speakers.[14] Similarly, Wayne Newton's case poses the danger that First Amendment values will be subverted by a local jury biased in favor of a prominent local public figure against an alien speaker who criticizes that local hero. Such was the backdrop against which the Supreme Court decided *New York Times,* and it is the scenario we face here, sixteen years later. Although our case resembles *New York Times* in this respect, it differs from *Harte–Hanks,* in which the jury resolved a dispute between a local politician and a local newspaper, and *Bose,* in which the plaintiff was an obscure corporation. Wayne Newton is a revered figure in Las Vegas.[15] His fellow citizens celebrate Wayne Newton Day and have named a major boulevard in his honor. As jurors, they awarded him $5 million in damages to reputation which "shocked the conscience" of the district court, precisely because the court itself determined that Newton's "outstanding reputation" had been unharmed by the stories. *Newton,* 677 F.Supp. at 1068.

We recognize that the risk of unbridled favoritism of local juries generally informs a decision about venue rather than stan-

---

Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

**13.** The factfinding function includes "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

**14.** In *New York Times,* the Commissioner of Public Affairs for Montgomery, Alabama, brought a civil libel suit against the *Times* and four individual black civil rights activists, including Dr. Martin Luther King, Jr. The publication at issue was a full-page advertisement entitled "Heed Their Rising Voices" and asked readers to contribute money to the Committee to Defend Martin Luther King and the Struggle for Freedom in the South. The advertisement

charged that "in their efforts to uphold the[ ] guarantees [of the Constitution and the Bill of Rights], ... [thousands of Southern Negro students] are being met by an unprecedented wave of terror by those who would deny and negate that document which the whole world looks upon as setting the pattern for modern freedom...." *New York Times,* 376 U.S. at 256, 84 S.Ct. at 713.

**15.** For example, Newton was named "Distinguished Citizen of the Year" in 1980 by the Clark County Chapter of the National Conference of Christians and Jews (RT 6:935) and at a Lincoln Day dinner in his honor in 1981, Newton was named the "Republican Man of the Year" in the state of Nevada (RT 8:1309).

dard of review.[16] However, in a case involving core First Amendment values, we cannot ignore the risk that a jury's credibility determinations may also subvert those values. We must attempt to discharge our constitutional responsibility to protect First Amendment values without unduly trenching on the fact-finding role of the jury and trial judge. We are mindful that in *New York Times, Bose,* and *Harte–Hanks,* the Supreme Court was fashioning a process for reviewing the evidence which permits judicial protection of First Amendment values while still paying due deference to the fact-finding role of juries, and particularly the jury's opportunity to observe the demeanor of the witnesses. Striking the proper balance is a daunting task. Although many of the crucial facts bearing on the issue of actual malice are uncontroverted, we face a voluminous trial record. The Supreme Court has left us with a line drawn between highly deferential review of credibility determinations and less deferential review of the factfinder's evaluation of other evidence relevant to the actual malice issue.[17] The line is a thin one, but tread it we must to ensure that future speakers need not fear to rush in. As Justice Roberts wrote for the Supreme Court in *Cantwell v. Connecticut:*

> In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excess-

es and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy.

310 U.S. 296, 310, 60 S.Ct. 900, 906, 84 L.Ed. 1213 (1940).

### III

Before conducting the independent review mandated by *New York Times, Bose,* and *Harte–Hanks* —a review in which we give special deference to the jury's and district court's credibility determinations but conduct a more searching review of other evidence germane to the actual malice determination—it is necessary to state in some detail the evidence on the actual malice issue.

For the most part, the facts in this case are not in dispute. Much of the evidence about the federal investigation involving Newton's possible connection to East Coast organized crime families is uncontroverted. This evidence falls into three categories: Newton's involvement with the Mafia, Newton's testimony before Nevada state gaming authorities, and the federal investigation of the Gambino family's efforts to enter the Las Vegas casino business.

Newton himself testified at trial about his relationship with Guido Penosi. Newton testified that his office calendar noted Guido Penosi's birthday, that Penosi had attended his brother's wedding, and that he had eaten a dinner prepared by Penosi's wife at the couple's home. Reporter's Transcript (RT) at 3:408–10; 3:371–99; 6:974. Newton also performed on a television special without compensation for Penosi's son, arranged for Penosi to visit Las Vegas, and visited with Penosi for approximately 20 minutes at Newton's home.[18]

**16.** We note, however, that some courts have referred to the decision as to venue of public figure defamation cases as being of "constitutional stature." *Buckley v. New York Post Corp.,* 373 F.2d 175, 183–84 (2d Cir.1967); *Westmoreland v. CBS, Inc.,* 8 Media L.Rep. (BNA) 2493, 2496 (D.S.C.1982).

**17.** This is the line drawn by the First Circuit Court of Appeals in *Bose* when it held that its review of the actual malice determination was not limited to the clearly erroneous standard of

Rule 52(a) but added that it was "in no position to consider the credibility of witnesses and must leave questions of demeanor to the trier of fact." *Bose Corp. v. Consumers Union of United States,* 692 F.2d 189, 195 (1st Cir.1982).

**18.** Newton testified about Penosi's visit to his home at trial. That testimony went as follows:

"Q. And he [Penosi] then came to your house, did he not?
"A. The next day, yes, sir.

The most important contact between Newton and Penosi came in early 1980 when Newton, alarmed about threats directed at both himself and his daughter by members of an organized crime syndicate, asked Penosi if he could stop the threats.[19] Penosi told Newton to call Frank Piccolo and provided Newton with Piccolo's Connecticut phone number. Newton thereupon called Piccolo and explained his problem while Penosi listened on an extension phone.[20] FBI tapes recording telephone conversations between Piccolo and Penosi reveal that Piccolo arranged with members of the Genovese family, which was threatening Newton, to stop the threats.[21] Penosi came to Las Vegas after the threats against Newton had ended. He visited with Newton in his dressing room and Newton thanked him for his help.

Around the same time, Mark Moreno, Newton's old friend and business advisor, began receiving threats. He went to Newton, who told Moreno to call Penosi. Penosi then told Moreno to call Piccolo. Moreno did so. A few days later, Penosi asked Newton to call Piccolo personally. Once again, Newton called Piccolo and asked for his assistance. In this call, Newton told Piccolo (as Penosi had told him to do) that Moreno was "with" Newton and was part of Newton's team.[22] Once again, Piccolo met with members of the Genovese family. At the meeting, agreement was reached for Penosi to pay $3,500 to have the threats against Moreno called off.

Having helped Newton out of his difficulties, by applying pressure, using personal contacts, and paying money, Piccolo sought to "earn" from Newton. First, he pressed Moreno to buy life insurance for Lola Falana, a Las Vegas entertainer managed by Moreno, and a friend of Newton's, through an insurance agent introduced to Moreno by Piccolo. Taped telephone calls between Piccolo and Penosi contain references to the Mafia's desire to "earn" from Newton, and to Piccolo's particular interest in the Aladdin.[23]

19. Newton testified at trial as follows:
"Q. Now, before you called Guido Penosi [about the threats], did you even think of contacting any other body of law enforcement other than [Las Vegas] Metro ... ?
"A. No, sir.
"Q. Did you even consider calling the FBI?
"A. It wouldn't have helped.
"Q. You know that, Mr. Newton?
"A. Yes, sir.
"Q. You knew that then?
"A. No, sir." (RT 6:1015–16)

20. Newton claimed ignorance as to the identity and location of the individual Penosi told him to call. He testified at trial as follows:
"A. So he [Penosi] called back.... And he said, 'When I call you back I'm going to give you a number, ... a guy will answer, and I will be on the extension.' And he said, 'Simply tell him the story, nothing more, nothing less.' I said 'okay.'

.    .    .    .    .

"I did call, a guy did answer. Guido was on the extension. I said, 'This is Wayne Newton.' And I related the entire story." (RT 3:441)

21. The arrangements between the Gambino family and the Genovese family on behalf of Newton and Moreno, *see supra*, pp. 672–673, are the one event in the story of Wayne Newton's relationship with various persons involved in organized crime about which Newton himself did not testify. This information came from FBI tapes, which were played to the jury, and portions of the grand jury testimony, which were also released to the parties.

22. Newton testified as follows:
A. "Mark came to me and said, 'Guido called and you're to call this number and ask for Frank, and you're to tell him that Lola Falana is part of your team and Mark works for you.'

.    .    .    .    .

So I called the number again and I asked for Frank, and he said 'Yes.' And I said, 'This is just to let you know that Mark Moreno works for me....'

.    .    .    .    .

He said 'Okay, that's all I need to know.' " (RT 6:870)

23. One taped telephone conversation contained the following exchange. Penosi: "they're throwing roadblocks and all that ... you know ... and, ah ... they don't want him to have the hotel...." Piccolo: "Yeah, but it would be nice if [Newton] would." Ex. 356 at 2; ER 195–96.

"Q. You sent a car for him?
"A. Yes, sir.
"Q. What's your best estimate of how long he was at your house?
"A. I would guess anywhere from 15 to 25 minutes, 15 minutes, 30 minutes, I don't know. (RT 6:987)

In July 1980, these taped telephone conversations came to the attention of Brian Ross and Ira Silverman, two NBC journalists who specialized in organized crime reporting. Ross and Silverman first learned that Piccolo was being investigated and that tapes existed of telephone conversations between Piccolo and Penosi and Mark Moreno. The conversations, the reporters learned, seemed to involve Wayne Newton and the Aladdin Hotel. Federal law enforcement officials were interested in investigating the connection between high-level Mafia figures and Newton's contemplated purchase of the Aladdin. Ross and Silverman, too, became interested and started their own investigation.

At the same time, the Nevada gaming authorities were conducting their own investigation of Newton in connection with his application to own and operate the Aladdin. On a number of occasions in July and August 1980, Newton was interviewed by Nevada Gaming Board investigators. The tape of the August 27, 1980 interview was admitted into evidence in the defamation trial. In that interview, Newton, under oath, answered several questions asked by a group of Gaming Board investigators led by Fred Balmer.

Balmer told Newton during the interview that Penosi was involved in organized crime.[24] According to Balmer, Newton "was asked very specific questions, based on the information that we had, with regard to his contacts with Mr. Penosi, and in addition to that he was asked if there had been any additional contacts or is there any other financial or business or any other contacts he had with relation to Mr. Penosi."[25] RT 11:1963–64. Newton told Balmer that Penosi had seen him perform at the Copacabana Club in the early sixties and that he had had some contact with Penosi during the last six months after Newton had received threatening telephone calls. Newton professed to being unclear about how he had involved Penosi, however. "[E]ither Guido called me or I called him and I don't remember which ...," he told Balmer. Ex. 91 at 1; ER at 206 (transcript of taped interview). Somewhat later in the interview, Balmer said:

And we are also aware that after you did contact Mr. Penosi, he made contact with an individual who is from back East in the New England states, ah Piccolo, who is heavily involved with organized crime, also. He did come to the Las Vegas area and our information is he did take care of these individuals for you.

Ex. 91 at 7; ER at 206. To which Newton responded, "Well, if it did happen, ah, I don't know who that is and I'm still getting threats as of last week."[26] *Id.*

---

24. Newton testified at trial as follows:
"Q. Did you believe Mr. Balmer that Mr. Penosi was involved in organized crime?
"A. I have no reason to consider it either way, Mr. Abrams.
"Q. Is it a matter of indifference to you?
"A. Relatively so, yes." (RT 6:1029)

25. Mr. Balmer testified at trial as follows:
"Q. Did you ever ... ask Mr. Newton to tell you every contact and every conversation he had ever had with Guido Penosi, in those words?
"A. No, not in those exact words. But he was asked very specific questions, based on the information that we had, with regard to his contacts with Mr. Penosi, and in addition to that he was asked if there had been any additional contacts or is there any other financial or business or any other contacts he had with relation to Mr. Penosi.
"Q. And he told you no business?
"A. That's correct, yes.
"Q. And he told you he did a—a something for charity for Penosi's son Anthony?

"A. Yes, after we had learned that, he told us that, yes.

"Q. [I]s it your best recollection that you gave Mr. Newton a fair chance to set forth the entirety of his dealings through the years with Guido Penosi?
"A. I would say that we gave him a more than adequate opportunity during the interviews that we conducted with him to tell us anything that he knew about Mr. Penosi, other than, you know, what we specifically knew and we specifically questioned him about." (RT 11:1963–64; 11:1968–69)

26. This testimony contradicts Newton's testimony at trial in which he stated that the threats had ended. RT 7:1046. Newton's response at trial to questions asking why he had not told Agent Balmer that he had spoken with any individual in the east at Penosi's request was as follows:
"Q. When Mr. Balmer said to you, Mr. Newton, that after you did contact Mr. Penosi he

At the conclusion of Balmer's interviews with Newton, Balmer and his colleagues remained unaware of the following: Newton's sending a car to pick up Penosi when Penosi came to Las Vegas; Penosi's visiting Newton's house; any meeting between Penosi and Newton after the threats against Newton stopped; and Newton's speaking with Frank Piccolo or anybody else at Penosi's request in an effort to stop the threats.

Meanwhile, Ross and Silverman continued to gather their own information. Here, an important conflict in the oral testimony emerged. Ross testified that upon his return to the East Coast, he learned from a knowledgeable, confidential source

> made contact with an individual who was back east in the New England states, did you tell him that, in fact, you had called someone in the New England states—
> "A. No, sir, I didn't.
> "Q.—at the request of Mr. Penosi?
> "A. No, sir, I didn't. I didn't know where I called.
> "Q. You dialed an area code, Mr. Newton?
> "A. Yes, sir.
> "Q. You had no idea what part of the country the area code·was in?
> "A. No sir.
> "Q. And when Mr. Balmer said to you, Mr. Penosi made contact with an individual who was from back east in the New England states, 'Piccolo' he called him, who was heavily involved in organized crime, why didn't you tell him that you had made two calls at Mr. Penosi's explicit request to someone else to help solve your problem?
> "A. It didn't occur to me, Mr. Abrams." (RT 6:1030)

**27.** Ross testified at trial as follows:
> "Q. Reading from your deposition of September 3, 1982 ...
> Answer: Source three provided information that Frank Piccolo was a capo in the Gambino Mafia family who had been given the Connecticut territory to run for gambling, loansharking, and other mob rackets, that Piccolo had become very wealthy, had had a lot of money to invest.
> Piccolo was a frequent visitor to the Ravenite Social Club in lower Manhattan, a known meeting place for the Gambino Mafia family.
> And for more than a year the FBI had been investigating Frank Piccolo with other members of the Gambino Mafia family. On at least one occasion Mr. Piccolo was overheard to be in a conversation with other mobsters in which he was asked whether he would be interested in investing in Atlantic City in supposed mob rackets down there.

with whom he had worked both before and after the Wayne Newton story, that police in New York had learned, either through an undercover agent or a listening device planted at a well-known meeting place for members of the Gambino family, that Piccolo's associates in the Gambino family had asked him if he wanted to go in with them in Atlantic City. Piccolo said he did not, because he had taken care of a problem for Wayne Newton and was going to have some sort of interest in the Aladdin Hotel.[27] At trial, Newton offered the testimony of two New York City police department officials who stated that, based upon a thorough search of department records in which such information would be retained, no such overheard conversation came to

> He said, no, he was involved with Wayne Newton in Las Vegas and he was going to be in the Aladdin, unquote.
> Did you so testify?
> "A. Yes, I did.
> "Q. And was the testimony truthful?
> "A. Yes it was.
>
> .    .    .    .    .
>
> "Q. Were you certain in your mind, when the broadcast was broadcast on October 6, 1980, that you had been told by a reliable source that Frank Piccolo had told associates that he had taken care of Newton's problem and had become a hidden partner in the Aladdin Hotel deal?
> "A. I was certain of that. No doubt in my mind.
>
> .    .    .    .    .
>
> "Q. Isn't one source too few to broadcast a statement such as the last part of this statement, that Mr. Piccolo was saying he had become a hidden partner in the Aladdin Hotel deal?
> "A. Not really, for two reasons.
> One, this source is really a top quality source who Ira [Silverman] and I had worked with before and since, was very knowledgeable, just given his position.
> Secondly, other information that we heard tended to confirm what we were being told, that from the source called source B Ira was hearing that Piccolo was, in fact, telling mobsters in conversations that they were hearing on the phone that he had taken care of a problem for Wayne Newton, he was going to earn from the singer, he was going to earn from Newton, he was going to be involved in this life insurance policy. The information tended to—one set of information tended to confirm the other set of information].
> "Q. And why does that matter?
> "A. It matters because nothing stuck out as a red flag, nothing suggested that it was wrong." (RT 27:5600–5601; 27:5603–5606)

the attention of the New York City Police Department.[28] On cross-examination, however, one officer testified that while it would be contrary to policy and practice for a member of the Police Department to have had a conversation with Ross or Silverman about the kind of information in the broadcast, it is possible that members of the Police Department did so. RT 18:3601–04. The second officer went further, testifying that he assumed that members of the Police Department do talk to the press without advising the intelligence division. RT 22:4615.

Silverman also testified that he had a confidential source inside federal government, whom he called "source B." Silverman said he learned from source B that Piccolo and Penosi considered Newton to be a "mob asset" in Las Vegas. According to source B, Piccolo and Penosi were hoping to exploit their relationship with Wayne Newton and were trying to profit from that relationship. RT 23:4790–91. Silverman also testified that source B told him that Newton had not told Nevada gaming authorities the whole story about his relationship with Penosi. RT 23:4699–4700; 4702.[29]

On September 25, 1980, the Nevada Gaming Board held a public hearing on Newton's application for a license to own and operate the Aladdin Hotel. Ross and Silverman attended the hearing as part of their investigation. In his sworn public testimony before the Gaming Board, Newton stated that he first met Penosi when he was sixteen or seventeen years old. He acknowledged seeing Penosi in Florida at Penosi's home but testified falsely that Penosi had never visited him at his home.[30]

28. The following excerpt from Lieutenant John Ferguson's deposition was read to the jury at trial:

"Q. Was it contrary to the usual practice of the police department of the City of New York ... to supply to a member of the news media information which pertained to or was reflected by the statement on television quote, police in New York say that this mob boss Frank Piccolo told associates he had taken care of Newton's problem and had become a hidden partner in the Aladdin Hotel deal, unquote?

"A. Yes.

"Q. If information had been obtained by the police department of the City of New York ... which pertained to or was reflected by the statement made during a television broadcast on October 6, 1980, quote, police in New York say that this Mob Boss Frank Piccolo told associates he had taken care of Newton's problem and had become a hidden partner in the Aladdin Hotel deal, unquote, would that have been the type of information which would have been reflected, contained, referred to or mentioned in a record, report, statement, memorandum or data compilation made and preserved by the police department of the City of New York?

"A. If such information had been obtained, it is the policy of the New York City Police Department to record such information.

"Q. Has a diligent search been made to find out whether there exists any [of the above-mentioned] records ... ?

"A. Yes.

"Q. What has been the result of the search ... ?

"A. A search was made of the records of the investigation and analysis section of the Organized Crime Control Bureau and no such recording or writing has been found." (RT 18:3591–93)

29. Silverman testified as follows:

"Q. Do you recall attending the hearing of the Nevada State Gaming Control Board regarding Wayne Newton's licensure on Thursday, September 25, 1980?

"A. Yes, I do.

"Q. Do you recall listening to Wayne Newton's testimony when Board Member Mauldin asked Mr. Newton whether he, Mr. Newton, was planning to continue his relationship with Guido Penosi?

"A. Yes, I did.

"Q. I take it sir, you watched the out-take showing that question by Board Member Mauldin and the complete answer by Wayne Newton?

"A. A number of times.

"Q. So the language of Mr. Newton's answer in totality is fresh in your memory, correct, sir?

"A. I watched it. I think it's fresh.

"Q. Did you shortly after that hearing call source B and tell source B on the telephone that Wayne Newton had given testimony under oath before the Nevada State Gaming Control Board in which Wayne Newton had under oath denied any relationship with Penosi?

"A. I would think something like that, a relationship, yes.

"Q. Did you in reliance on what source B answered you when you reported that to source B, whether it be man or woman, on the telephone, in part formulate the script language 'Federal authorities say Newton is not telling the whole story'?

"A. In part, yes." (RT 23:4699–4700)

30. "Gaming Board member [Mauldin]: Has he [Penosi] ever visited you in your home?

"Newton: No, sir." (RT 5A:50A; ER at 211).

Newton summed up his relationship with Penosi by stating:

> In the approximately 21 years from the time I met him, I might have seen this man four times. So, my relationship is just that of a fan, really.

RT 5A:49A–50A; ER 210. After he had been advised by a Gaming Board member that Penosi was a purported member of the Gambino organized crime family, Newton was asked if he were going to continue any relationship with him. Newton replied:

> Well, on the basis of which I have known him, I don't think that there has been a relationship, Mr. Mauldin. The direct answer to your question obviously is no if he has those kind of connections.

*Id.* at 50A–51A.

Newton also testified falsely before the Gaming Board that Mark Moreno was only a friend, that Moreno had no business or contractual position with him, and that Moreno was not his manager. In response to a specific question asking whether Moreno was "a representative of [his] in any way, shape or form," Newton replied that they had "[n]o association whatsoever."

*Id.* at 58A–59A.[31] Moreno testified at trial that he had checked out one proposal to purchase the Aladdin and prepared a back-up deal for another; arranged and attended meetings on Newton's behalf relating to the purchase of the Aladdin; sought potential partners for Newton; and drafted Newton's contract to become executive director of entertainment at the Aladdin.[32] RT 15:2784–93; 12A:30A.

At the Gaming Board hearing, representatives of the Valley Bank of Nevada also testified that the Valley Bank was providing financing to help Newton acquire his interest in the Aladdin. Newton, with financing from Valley Bank, planned to buy a 50 percent interest in the Aladdin and to commit to perform there at least 20 to 26 weeks a year. The Gaming Board concluded the hearing by recommending that Newton be licensed.

Immediately after the hearing, Ross sought to interview Newton. In response to questions from Ross, Newton falsely stated that he had last spoken with Penosi "maybe a year ago" and that Penosi had made no phone calls to him.[33] Ross fol-

---

Newton's explanation at trial of this false testimony was as follows:

"Q. Mr. Newton, that was not true, was it?

"A. No, sir, not in the context in which you are stating it. It was true in the context in which I interpreted the question.

"Q. Mr. Penosi had come to your home, had he not?

"A. I sent a car for him, yes, sir.

"Q. Mr. Penosi talked with you at your home?

"A. I assume we talked, yes, sir.

"Q. He stayed at your home for 20, 25, 30 minutes, I think you said?

"A. Approximately 15, 30 minutes, somewhere in there.

"Q. He went away from your home in the car that you had provided him."

"A. I didn't provide him a car. I provided him a ride. I believe I had someone pick him up and take him back."

"Q. You believe you told the whole story when you responded to the question has he ever visited you in your home and you said no, sir?

"A. In the context in which I understood the question, yes, sir." (RT 7:1114–15)

**31.** Newton explained at trial that he understood the question from the Gaming Board asking him if Moreno was "a representative of [his] in any way, shape or form" to ask instead if he had

a "contractual arrangement" with Moreno. RT 7:1089–90.

**32.** Moreno testified at trial as follows:

"A. I was not employed by Mr. Newton at that time. I was not being paid by Mr. Newton, I was not asking for compensation. I was doing what I could as a friend and being in a position myself because of my long association with the Aladdin to put Mr. Newton where he wanted to be.

"Q. But you had been representing Mr. Newton in various matters that you have described to us, were you not?

"A. As I said before, I don't know if representing in the legal sense is a correct term. I was doing everything I possibly could so that Mr. Newton could purchase the Aladdin Hotel.

"Q. And what you were doing was very substantial in terms of your own time, was it not?

"A. I would say yes.

"Q. You were working round the clock at certain points at least to try to get the Aladdin for Mr. Newton, right?

"A. That's correct, sir." (RT 15:2793–94)

**33.** At trial, Newton testified as follows about his response to Ross as to when he had last spoken with Penosi:

"Q. Was that true, Mr. Newton?

lowed Newton as Newton left the building in which the Gaming Board had met and walked to a car in the parking lot. At the car, Ross asked Newton about threats made upon his family, inquiring whether Penosi had ever been in Las Vegas to provide protection for Newton or his children. Frank Fahrenkopf, Newton's attorney, replied, "[c]ome on, that's silly." Fahrenkopf and Newton offered no other answer or explanation. RT 5B:9B.

The granting of a license to operate a casino in Nevada requires approval from both the Gaming Board and the Nevada Gaming Commission. On September 26, 1980, the Commission held a hearing, approved the recommendation of the Gaming Board, and granted Newton a license to own and operate the Aladdin Hotel. At the hearing, Fahrenkopf submitted an affidavit signed by Newton stating that the affidavit was to "supplement the record in addition to the testimony made by Mr. Newton [before the Gaming Board] yesterday concerning" Penosi. In the affidavit, Newton disclosed that he had seen Penosi once in the last 13 years when Penosi had visited Las Vegas. The affidavit also stated that Newton had appeared on a television special produced by Penosi's son. The affidavit did not disclose Penosi's visit to Newton's home, or Newton's arrangements for Penosi to stay in one of his rooms at a hotel. The affidavit also failed to mention the calls to, conversations with, and meeting with Penosi during the death-threat episode.

In preparation for the October 6, 1980 broadcast, Ross and Silverman investigated some additional sources. On September 26, the journalists met with Johnny Carson, who had unsuccessfully bid for the Aladdin earlier. Ross and Silverman asked Carson questions about his earlier negotiation for the hotel. Although Penosi's name was mentioned during the interview, Carson had never heard of Penosi and could not offer any information about him.[34]

The NBC journalists and Moreno testified that Ross and Silverman also interviewed Mark Moreno to discuss Moreno's and Newton's possible connections with Penosi and Piccolo. Moreno testified, and Ross agreed, that Moreno told Ross that the contacts between Penosi and Newton had nothing to do with the purchase of the Aladdin, but concerned death threats against Newton and his family. According to Silverman, Moreno said that there were local hoods in Las Vegas who had given Newton trouble.[35] Moreno also testified that he told the journalists that Penosi's involvement in stopping the threats directed at Newton and his family would be revealed in an affidavit being prepared by Fahrenkopf. That affidavit, as discussed earlier, did not mention any threats.

Ross and Silverman also sought to interview Newton, although there was conflict-

---

"A. No, it wasn't. But I didn't realize I was under oath to Mr. Wimp [Brian Ross] over there." (RT 7:1146)

**34.** The following excerpt from Carson's deposition was read to the jury:

"Q. Is there anything else you recall these gentlemen [Ross and Silverman] saying to you?

"A. The name Penosi was brought up. I did not know the gentleman, had never heard of the name.

.    .    .    .    .

"Q. You remembered the name Penosi. What did they indicate to you?

"A. They didn't indicate anything to me. I didn't know the name or know the gentleman." (RT 16:3175; 16:3176)

Newton uses this deposition testimony to insinuate that Ross and Silverman told Carson that Newton was involved with Penosi in the purchase of the hotel. Appellee's Brief at 79. By eliminating 20 lines of Carson's deposition

testimony, Newton distorts the substance of Carson's remarks and suggests that the journalists tried to drop sinister references to Penosi into their questions about Newton's deal for the Aladdin.

**35.** Moreno testified at trial about his conversation with Ross and Silverman as follows:

They basically told me that I was not the crux of the story, and that Miss Falana was not the true crux of the story. This was just to get my attention that who they really wanted to get was Wayne Newton. And if I would come down and speak to them about Mr. Newton's reported organized crime connections concerning his purchase at the Aladdin Hotel, that I would not in any way be implicated in their story, and Miss Falana would not in any way be implicated in their story. I refused to do that.

RT 14:2715–16.

ing testimony about the strength of their efforts to schedule the interview before the October 6 broadcast. The NBC journalists claim that they continually sought and were denied permission to interview Newton. Newton, on the other hand, testified that he did not know that NBC wanted to interview him about Penosi. RT 5:707–708. However, it is undisputed that Ross and Silverman made some attempts to interview Newton and that Newton rebuffed them at least once. For example, the testimony of Newton and his secretary, Mona Matoba, shows that when Silverman called to ask for an interview, Newton instructed Matoba to find out "what kind of story they wanted to do." RT 7:1097. According to Newton, his secretary told him that the journalists' answer had been "the Aladdin and Guido Penosi" and that when he was advised of that, Newton told her to decline the interview. It is also undisputed that the journalists asked Moreno and a public relations executive named Ramon Hervey to help them arrange an interview with Newton.[36] Finally, it is undisputed that Ross actually interviewed Newton outside the hearing room in Carson City after Newton testified before the Gaming Board.

In sum, almost all of the facts reported by NBC in the October 6, 1980 broadcast are uncontroverted. Newton went to Penosi with a problem and Penosi called Piccolo who helped solve the problem. Piccolo and Penosi later discussed "earning off" Newton and possibly "earning off" his ownership of the Aladdin Hotel. Piccolo and Penosi were investigated and indicted by a federal grand jury, which heard the testimony of Wayne Newton. All these facts are beyond dispute.

## IV

We now review the evidence to decide if it yields a clear and convincing basis on which the jury's verdict that NBC and its journalists made a false and defamatory statement about Newton, knowing that the statement was false or entertaining serious subjective doubt about the statement's truth, may be sustained. We conclude that the jury verdict cannot stand because the evidence fails to prove constitutional malice with "convincing clarity." *Bose*, 466 U.S. at 511, 104 S.Ct. at 1965.

## A

We begin by reviewing the basis for the district court's approval of the jury's actual malice finding. Although we review the district court's JNOV decision de novo, *see Peterson v. Kennedy*, 771 F.2d 1244, 1252 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986), we believe that opinion to be a helpful point of departure for our independent review of the actual malice evidence. The district court upheld the jury's liability verdict because

> [t]he clear and inescapable impression made by the broadcasts was that [Newton] did not have enough money to buy the Aladdin Hotel so he called a friend, Guido Penosi, who had ties to organized crime; and that Mr. Penosi helped him raise the money and thus obtained a hidden interest in the Aladdin Hotel.

*Newton*, 677 F.Supp. at 1067. The district court concentrated on what it believed to be the impression created by the broadcast that the Mafia obtained a hidden interest in the Aladdin by helping to finance Newton's acquisition of the hotel.[37] Like the district court, we do not tarry with Newton's contention that actual malice is proven by NBC's statement that "federal authorities say that Newton is not telling [Nevada

---

**36.** Hervey testified that Silverman told him that Newton was a "hard guy to get to and I really would like to talk to him, just for a few minutes," RT 23:4688, and that Silverman was "persistent" in trying to enlist his assistance in getting an interview with Newton, *id.* at 4694.

**37.** Because the district court did not identify any false statement of fact, our review of its ruling speaks in terms of the impression which the district court considered. By our review of the district court's ruling we do not suggest that liability may be imposed for false impressions arising out of true statements. As we noted earlier, we do not reach that question. *Supra* n. 5.

Gaming officials] the whole story."[38] We therefore turn to the district court's reasons for finding actual malice on the part of the NBC journalists in connection with the deal for the Aladdin.

■ The court offered two arguments in support of its ruling. Even if NBC had unintentionally left the impression that organized crime had financed Newton's purchase of the Aladdin, the court concluded, it "should have been foreseen" by NBC and the failure to foresee it "shows a reckless disregard for the truth." *Id.* at 1068. The court also concluded that since NBC had "voluntarily edited and combined the audio with the visual portions of the broadcast in a way that created the defamatory impressions" and since those impressions were "clear and unescapable," the jury could reject as incredible the testimony of the NBC journalists that they had not intended to leave the false impression. *Id.* at 1067–68. Both of these rulings conflict with the principles of *New York Times* and *Bose.*

The district court erred in its ruling that an interpretation of the broadcast that "should have been foreseen" by the NBC journalists can give rise to liability. The district court's standard of what "should have been foreseen" is an objective negligence test while the actual malice test of *New York Times* is deliberately subjective. *Harte–Hanks*, 109 S.Ct. at 2696. The relevant inquiry asks whether a journalist "re-

alized that his statement was false" or whether he "subjectively entertained serious doubt as to the truth of his statement." *Bose*, 466 U.S. at 511 n. 30, 104 S.Ct. at 1965 n. 30. Negligence, weighed against an objective standard like the one used by the district court, can never give rise to liability in a public figure defamation case. "A 'reckless disregard' for the truth ... requires more than a departure from reasonably prudent conduct." *Harte–Hanks*, 109 S.Ct. at 2696. Accordingly, the district court erred in basing liability on an objective standard.

■ The district court also erred in relying on the proposition that the jury could have based a finding of actual malice on a determination that the journalists' testimony about their state of mind was not credible. In *Bose*, the Supreme Court held that:

When the testimony of a witness is not believed, the trier of fact may simply disregard it. Normally the discredited testimony is not considered a sufficient basis for drawing a contrary conclusion.[39]

*Bose*, 466 U.S. at 512, 104 S.Ct. at 1966; *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986).

The district court's analysis is strikingly similar to that of the district court in *Bose*, the reversal of which was affirmed by the Supreme Court, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). In *Bose*, the

38. The record is clear that Newton, in fact, did not tell the whole story to Nevada state gaming authorities. Newton's testimony before both the federal grand jury and the Nevada gaming authorities is a matter of public record. Assistant United States Attorney, Richard Gregorie, who represented the United States before the grand jury, testified at trial that, in his view, Newton had not told Nevada gaming authorities the whole story about his relationship with Penosi. RT 18:3498. And the record reveals that NBC's statement was accurate, even without attribution to federal authorities. For example, Newton falsely told the Board that Penosi had never come to his home or visited his dressing room. RT 6:987 (Newton testimony about Penosi's visit to Newton's home); RT 5A:50A; ER 211 (Newton testimony to Board that Penosi had never visited Newton's home); RT 7:1114–15 (Newton's trial testimony about testimony to Board). Silverman testified at trial that the ease

with which Penosi gained access to Newton, who was protected from most fans by a private body guard at his home and dressing room, aroused NBC's suspicion early in the investigation. RT 24:4699–4700; 4702.

39. Similarly, in *Dyer v. MacDougall*, 201 F.2d 265, 268–69 (2d Cir.1952), Judge Learned Hand held that a plaintiff could not meet his burden of proving that a defamatory statement had been made by showing that the jury disbelieved those who denied making it. Judge Hand stated that:

Nevertheless, although it is therefore true that in strict theory a party having the affirmative might succeed in convincing a jury of the truth of his allegations in spite of the fact that all the witnesses denied them, we think it plain that a verdict would nevertheless have to be directed against him. *Id.* at 269.

district court found that the author of an article had lied when he testified that the words he had used in an article about a stereo system meant something other than what the court interpreted them to mean. Since the witness was "an intelligent, well-educated person" and since the words had "the same meaning for [the witness] as they do for the populace in general," the district court determined that the witness's testimony was not credible. *Id.* at 511–12, 104 S.Ct. at 1965. The Supreme Court, in upholding the First Circuit's reversal of the district court's finding of constitutional malice, concluded:

> [The author of the article] of course had insisted 'I know what I heard.' The trial court took him at his word, and reasoned that since he did know what he had heard, and he knew that the meaning of the language employed did not accurately reflect what he heard, he must have realized the statement was inaccurate at the time he wrote it. 'Analysis of this kind may be adequate when the alleged libel purports to be an eyewitness or other direct account *of events that speak for themselves.' Time, Inc. v. Pape,* 401 U.S. [279], at 285 [91 S.Ct. 633, 637, 28 L.Ed.2d 45 (1971). See generally *The Santissima Trinidad,* 7 Wheat. 283, 338–339 [5 L.Ed. 454] (1822). Here, however, adoption of the language was 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer. *Time, Inc. v. Pape, supra* [401 U.S.], at 290 [91 S.Ct. at 639]. The choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella. Under the District Court's analysis, any individual using a malapropism might be liable, simply because an intelligent speaker would have to know that the term was inaccurate in context, even though he did not realize his folly at the time.

*Id.* at 512–13, 104 S.Ct. at 1966 (emphasis in original).

■■■ As *Bose* demonstrates and as *Harte–Hanks* reasserts, 109 S.Ct. at 2696

n. 35, constitutional malice does not flow from a finding that an "intelligent speaker" failed to describe the words he used as the finder of fact did. Nor is it permissible to uphold the jury's verdict against NBC on the ground that, because the defendants are trained journalists (or, as in *Bose*, "intelligent speakers") or because the broadcast may be capable of supporting the impression Newton claims, NBC must therefore have intended to convey the defamatory impression at issue here.

Yet that ground, in the end, is the basis for the district court's ruling: since the implication it took from the broadcast was "clear and inescapable" to the court, it concluded that the jury could properly find that NBC and its journalists intended to leave that impression. Such an approach eviscerates the First Amendment protections established by *New York Times.* It would permit liability to be imposed not only for what was not said but also for what was not intended to be said.

The district court erred because it substituted its own view as to the supposed impression left by the broadcast for that of the journalists who prepared the broadcast. This substitution gave the trier of fact an expanded role which *New York Times, Bose,* and *Harte–Hanks* do not permit.

### B

We now turn to the record and conduct our own independent review of the evidence to determine if it provides a clear and convincing basis for the jury's finding of actual malice.

### 1.

■■■ Newton argues that an inference of actual malice is raised by NBC's failure to mention in the October 6, 1980 broadcast the death threats as a possible explanation for his contact with Penosi. NBC replies that Newton's argument is irrelevant because mention of the death threats would not have lessened the defamatory impact of the broadcast.

We agree with NBC. A hypothetical broadcast comprised of both the informa-

tion actually disclosed in the October 6, 1980 broadcast and the undisclosed possibility that Newton may have contacted the mob seeking protection from death threats would have been no less defamatory than the October 6, 1980 broadcast itself. We fail to see how disclosing the fact that Newton had appealed to the mob for such protection would have changed the defamatory impact of the broadcast. All the essential ingredients of the broadcast would have remained: the ongoing federal investigation; the fact that Newton had had financial difficulties; the fact that he had sought and obtained the assistance of organized crime; the fact that that assistance had included high level criminal figures helping Newton out; and the fact that those figures then spoke with each other about "earning" off Newton after he was licensed to run the Aladdin. The inclusion of the additional fact that Newton had contacted the mob seeking protection from death threats would not have changed the substance of the broadcast.

Even if we agreed with Newton that failure to mention the death threats increased the defamatory impact of the October 6 broadcast, that fact would not support an inference of actual malice because the evidence still fails to show with convincing clarity that the journalists acted with the requisite state of mind. The primary inquiry is whether in failing to mention the death threats they "realized that [their] statement was false or that [they] subjectively entertained serious doubt as to the truth of [their] statement." *Bose*, 466 U.S. at 511 n. 30, 104 S.Ct. at 1965 n. 30 (citing *New York Times*, 376 U.S. at 280, 84 S.Ct. at 726).

Ross and Silverman testified that they did not have sufficient credible evidence to state in the first broadcast (as they did in later broadcasts) that threats had been made. The major source of the information that the "problem" Penosi and Piccolo had solved for Newton concerned threats against Newton and his family was Moreno, who the NBC journalists had decided was unreliable.[40] The question of Moreno's credibility poses the double-layered credibility dilemma faced by the Supreme Court in *Harte–Hanks*. In *Harte–Hanks*, the Supreme Court reviewed a jury finding of actual malice which involved conflicting oral testimony of two sorts: discrepancies in the testimony of the newspaper's witnesses, 109 S.Ct. at 2694, and irreconcilable disagreement between the newspaper's sources. We face the same situation. Newton argues that the NBC journalists knew that he called Penosi and Piccolo with a security problem, not a financial one, and he predicates his argument on the assumption that the journalists should have considered Moreno a credible witness. In other words, Newton argues that because the journalists claimed that they found Moreno to be incredible, the jury must have concluded that the journalists were lying. This convoluted credibility assessment rests squarely before us because, like the jury in *Harte–Hanks*, the Newton jury heard testimony from and observed the demeanor of both the journalists and the source, Moreno.

*New York Times* and its progeny protect journalists and publishers from liability based on errors of fact that arise from reliance on a credible source. In *St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), the Supreme Court held that a journalist who relies on a source whose reliability is unknown, has not published false information with actual malice if the journalist made some effort to verify the source's information. The Court in *St. Amant* reviewed a

---

**40.** Appellee argues that both source B and an agent of the Nevada Gaming Control Board told Ross and Silverman that Newton had contacted Penosi because of the death threats. However, the message conveyed by these sources, as recounted in the testimony of the agent, as well as that of Silverman and Ross, is quite ambiguous and couched in terms of a *possible* explanation for the Newton–Penosi contact. *See* RT 16:3038–39 (testimony of Agent Shepard); RT 23:4782–83 (testimony of Silverman); RT 25:5225–26 (testimony of Ross). Such statements cannot serve as support for a finding that the reporters' decision to refrain from making a statement in the broadcast constituted actual malice. Thus, we restrict our examination to the reporters' decision to discount Moreno's statements.

record which contained "no evidence ... of [the source's] reputation for veracity" but nevertheless concluded that the defendant had not published false information with constitutional malice. 390 U.S. at 733, 88 S.Ct. at 1326. The Court suggested that reckless disregard for truth could be predicated on reliance "wholly on an unverified anonymous telephone call," *id.* at 732, 88 S.Ct. at 1326, but found that when the publisher had not deemed the source to be "unsatisfactory," and had verified aspects of the information, *id.* at 733, 88 S.Ct. at 1326, there was no reckless disregard. *Id.* One of our colleagues has also noted the important free speech values inherent in a journalist's evaluation of a source:

> Newspapers and other media regularly digest a veritable avalanche of facts; these facts must be gathered from diverse sources, not all of equal reliability; judgments as to accuracy must often be made on the basis of incomplete information and under the pressure of a deadline. Newspapers might never be published if they were required to guarantee the accuracy of every reported fact; time and manpower do not permit the type of verification that would prevent all mistakes.

*Masson v. New Yorker Magazine, Inc.*, 895 F.2d 1535, 1557 (9th Cir.1989) (Kozinski, J. dissenting). We conclude that the importance of protecting a journalist's use of diverse sources and investigative techniques requires that we apply the heightened First Amendment standard of review to the question of Moreno's credibility in the eyes of the NBC journalists. Accordingly, we will not pay special deference to how the jury *may* have regarded Moreno's credibility as a trial witness.[41] The credibility of a source goes directly to the circumstances under which a journalist writes a story. The importance of permitting journalists to interview diverse sources, pursue multiple story lines, and draw their

own honest and professional conclusions from their research dictates that the media should not fear that its journalists' professional judgments will be second-guessed by juries without the benefit of careful appellate review. As *New York Times* makes clear, "we 'examine for ourselves the statements in issue and the circumstances under which they were made.' " 376 U.S. at 285, 84 S.Ct. at 728 (citing *Pennekamp v. Florida*, 328 U.S. 331, 335, 66 S.Ct. 1029, 1031, 90 L.Ed. 1295 (1946)).

█ We find support for our conclusion in *Harte–Hanks*. In assessing the evidence of actual malice before the jury in that case, Justice Stevens, writing for the Court, drew his own conclusions about the credibility of the newspaper's source. He noted that "[t]he hesitant, inaudible and sometimes unresponsive and improbable tone of [the source's] answers to various leading questions raise obvious doubts about her veracity." *Harte–Hanks*, 109 S.Ct. at 2698. Accordingly, we hold that the credibility of a journalist's source is a separate inquiry from the credibility of the journalist himself and that we apply a heightened review to the evidence regarding whether the publisher was reckless or knowingly false when he relied upon information provided by his source.

In this case, the undisputed·evidence shows that NBC and its journalists were not reckless in disregarding Moreno's information about threats. Ross and Silverman testified that they were uncomfortable with Moreno because they knew that federal and state authorities had investigated Moreno's own considerable connections with organized crime figures. The journalists also testified that they believed Moreno to be an unreliable source because he had claimed that he had been intimately involved in the purchase of the Aladdin on behalf of Newton, in contradiction to Newton's testimony at the Board hearing that he had "no association whatsoever" with Moreno.[42] *Supra* p. 677. Newton's denial persuaded

---

**41.** *Harte–Hanks* supports this conclusion. There, the Court rejected the approach of the Court of Appeals, which had considered the facts which that jury "could have" found, and instead the Court concentrated on the less spec-

ulative ground of what the jury *"must"* have rejected. *Harte–Hanks*, 109 S.Ct. at 2697.

**42.** The ultimate fact that Newton was disingenuous in making this response does not alter the fact that Ross and Silverman had reason to

the NBC journalists to attach no weight to what Moreno had told them. This conclusion derives support from Moreno's statement to the journalists that Newton's affidavit would explain all relations with Penosi, when the affidavit contained only sparse information about the television special Newton had helped make for Penosi's son. *Supra* p. 678-679. Finally, Newton's attorney, Fahrenkopf, who enjoyed an excellent reputation in the community and with NBC, flatly denied, in Newton's presence, that Penosi had protected Newton from threats. Regardless of whether the jury believed Ross and Silverman about their states of mind in considering the possibility of referring to threats in the broadcast, the uncontroverted facts about discrepancies between Moreno's information and the information the journalists heard from Newton or his representatives, negates a finding of reckless disregard for truth. Newton cannot fault NBC for relying on his own statements. As one court put it, "[I]t would be ironical and certainly inequitable for the plaintiff to profit here from his own misstatements." *Friedman v. Boston Broadcasters, Inc.*, 13 Media L.Rep. (BNA) 1742, 1744 (Mass.Super.Ct.1986). *rev'd on other grounds*, 402 Mass. 376, 522 N.E.2d 959 (1988). We agree, and conclude that NBC's failure to refer to the threats in the October 6 broadcast fails to provide clear and convincing proof of actual malice.

### 2.

Newton also argues that the inclusion of a reference to his "financial problems"[43] in the October 6 broadcast suggests that NBC tried to bolster the idea that Piccolo had a hidden share of the Aladdin and so knowingly attempted to defame Newton. According to Newton, the fact that an early draft of the broadcast called his financial problems "serious" indicates that Ross and Silverman wanted to exaggerate his financial situation in order to suggest falsely that he had gone to the Mafia for money to help purchase the Aladdin. Newton offers NBC editor Gilbert Millstein's removal of the word "serious" from the final transcript as clear and convincing proof of actual malice.

■ We reject this argument on several grounds. First, the statement that authorities said that Newton had financial problems was true, and, as such, is incapable of supporting a finding of actual malice. The testimony of Glen Mauldin, a former member of the Nevada Gaming Board, shows that the Gaming Board was concerned about Newton's general financial situation, including his ability to finance his purchase and subsequent operation of the Aladdin. Prior to his purchase of the hotel, Newton was $75,000 a month short in meeting his current obligations. The Aladdin purchase involved adding an additional monthly obligation of $85,000.[44]

■ Second, it is undisputed that a disagreement over an amount not less than $20,000 caused a fight between Newton and at least one low-level member of an

believe that Moreno, rather than Newton, was lying. The actual-malice inquiry looks at circumstantial evidence of what the journalists knew rather than at circumstantial evidence of what turned out to be correct.

**43.** The October 6 broadcast stated "[d]espite his big income, authorities say Newton has had financial problems." *Supra* pp. 666-667.

**44.** Mauldin testified at trial as follows:

"Q. At the rump session, Mr. Mauldin, did you make any statement with respect to the financial aspects of Mr. Newton's application?

"A. As I recall, I indicated that based upon my review and my staff's review of the financial information, Mr. Newton is having trouble meeting his current liabilities, and to add $85,000 a month to that could be very damaging to Mr. Newton's overall financial condition.

"Q. Did you understand at that time that Mr. Newton's income was very substantial?

"A. Yes. Very substantial. I think it was eight million, as I recall.

"Q. Did you hold the views you've just expressed notwithstanding that?

"A. A tremendous amount of expenses. He had—I was offering expenses for all of his properties. He had considerable obligations on most if not all of the properties he owned. There was expenses with regard to helicopters and airplane [sic]. He had borrowed a great deal of money just before that which appeared to be working capital. It appeared to me that he was having financial problems already." (RT 28:5804-05)

organized crime family. It was this disagreement that precipitated the threats to Newton and his daughter. NBC points out that $20,000 is a significant sum and that a debt to a mobster which leads to death threats presents a serious problem. We agree with NBC that its choice of words was reasonable. Although there is arguably some ambiguity in the broadcast about the severity of Newton's financial difficulties, that ambiguity, alone, does not sustain the burden of establishing with clear and convincing clarity that the journalists acted with knowing or reckless disregard of falsity.

▆▆▆ Finally, Newton's argument about the deletion of the word "serious" falls short of the mark. Editing to make a broadcast more understated and cautious cannot possibly be grounds for actual malice. The removal of the word "serious" has little, if any, probative value on the question of whether NBC knew that the statement in the broadcast was false. *Cf. Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 508 (3d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978) (fact that defendants, prior to broadcast at issue, considered charging plaintiff with using his public office for private gain and decided not to do so does "*not* demonstrate that they knew that utterances in the broadcast were of questionable validity"). To the contrary, as we demonstrate above, the statement appears to be accurate.

### 3.

▆▆▆ Newton also claims that NBC published the statement "Piccolo told asssociates that he ... had become a hidden partner in the Aladdin" with actual malice because Ross and Silverman heard testimony at the Gaming Board hearing that the Valley Bank was providing the Aladdin financing. The knowledge that the Valley Bank was financing the Aladdin deal should have ruled out the possibility that Newton could have a hidden partner, or so Newton's argument goes. This argument is also wide of the mark. As the testimony of Newton's own organized crime expert, Prof. Robert Blakely, made plain, the fact that the Valley Bank provided financing for the Aladdin did not answer the question of whether any hidden interest existed. Prof. Blakely testified that a hidden interest in a casino is normally not actual ownership of a hotel but an interest in the "skim," the amount of casino receipts not reported to the appropriate authorities as receipts. Such an interest would not be reflected in corporate documents or materials "available for public surveillance and public review." RT 13:2417–19. Accordingly, the fact that Ross and Silverman knew about the Valley Bank financing has little probative value on the issue of the journalists' actual malice in stating that Piccolo claimed to be a hidden partner in the Aladdin.

### 4.

▆▆▆ Newton also takes issue with several language choices and editing decisions made by the NBC reporters and editors. First, Newton objects to the wording of the sentence describing the grand jury investigation. Newton argues that NBC should have inserted the words "if any" or "possible" into the sentence "[a] federal grand jury is investigating the role of Guido Penosi and the mob in Newton's deal for the Aladdin." The broadcast would then have referred to "Penosi's role, if any," or to "Penosi's possible role." Quibbles over the precise wording of a sentence Newton concedes is true do not contribute meaningfully to the actual malice inquiry. Although Newton is correct that the insertion of his suggested language would have sharpened the meaning of the sentence, the omission has minimal probative value on the issue of actual malice. The sentence does not mislead listeners about the nature of the grand jury's investigation.[45] Complaints or dis-

---

**45.** The transcript of Newton's grand jury testimony was produced to the parties at the commencement of the trial in October, 1986. Newton was asked a number of questions about whether there was any relationship between Penosi and Newton's purchase of the Aladdin:

—"Does he [Penosi] have any business interests with you or financial?"

agreements about choice of language are editorial decisions that do not give rise to liability. As the Eighth Circuit has observed, "the First Amendment cautions courts against intruding too closely into questions of editorial judgment, such as the choice of specific words." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 272, 93 L.Ed.2d 249 (1986). At the worst, NBC's sentence was slightly ambiguous. Our circuit has barred the imposition of liability in a public figure defamation case based upon the use of ambiguous language. *Masson v. New Yorker Magazine, Inc.*, 895 F.2d 1535, 1544-45 (9th Cir.1989) (interpreting *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971)). *See also McCoy v. Hearst Corp.*, 42 Cal.3d 835, 862, 727 P.2d 711, 729, 231 Cal.Rptr. 518, 536 (1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987) (ambiguous evidence insufficient to establish constitutional malice).

Newton's complaints about two other NBC editing decisions fare no better. Newton objects to NBC's not including in the broadcast his entire response to a question asked of him at the Board hearing: "Are you planning to continue any relationship with Mr. Penosi?" The broadcast contained the first sentence of the answer: "Well, on the basis of which I've known him, I don't think there's been a relationship," but not the second sentence, "The direct answer to your question obviously is no if he has those kind of connections." RT 5A:50A-51A; ER 211; *supra* p. 677. Newton also objects to the broadcast's showing Newton's anger at Ross' questions in the parking lot without showing the earlier portion of the attempted interview which Newton claims provoked his anger. These objections challenge editing decisions by NBC about what material to include and exclude from the broadcast. Although the material included in the broadcast does not portray Newton in the most flattering light possible, that fact is irrelevant to the actual-malice inquiry. The challenged material was a true depiction of Mr. Newton's conduct during and after the Board hearing and was relevant to the NBC story. We decline to substitute our judgment for that of NBC in presenting its story. Editorial decisions about broadcasts are best left to editors, not to judges and juries.

### 5.

■ Newton also alleges that Ross and Silverman did not try hard enough to interview him and that their lack of vigorous pursuit provides evidence that they did not want to hear his side of the story. In *Harte-Hanks*, the Supreme Court found that the newspaper had engaged in the "purposeful avoidance of the truth," 109 S.Ct. at 2698, by, *inter alia*, deliberately choosing not to interview a critical eye-witness and deliberately determining not to listen to a critical audio tape. In this case, however, it is undisputed that Ross and Silverman tried at least twice to interview Newton and that Ross did in fact interview him once. The record contains no evidence that the NBC journalists deliberately tried to avoid the truth as they investigated the October 6 broadcast.

### 6.

■ Finally, we address a general argument pertaining to the jury's determination of actual malice. Newton asks us to consider as we review the broadcast that television allows the media to interpose sound and picture over words and to manipulate the impressions it creates with powerful broadcasting technologies. Because the average viewer only watches a television broadcast once, that viewer cannot parse each sentence with care to ascertain each word's precise meaning. According to Newton, we should refrain from carefully parsing each sentence because the overall

---

—"Were you ever approached by anybody, either connected with Mr. Penosi or connected with this gentleman by the name of Frank, about their possibly assisting in the financing of the Aladdin?"

—"Are there any points sold for the Aladdin now that aren't a matter of record with the Gaming Commission?"
Ex. 729 at 28-29, 31, 35; ER 224, 227, 228.

impression of television is bound to images and not to words.[46]

Newton misperceives the function of appellate review in a First Amendment case. We do not review a publication for the purpose of replicating the review it would receive from the average reader or listener. We review speech that has been alleged to be defamatory to determine whether or not it falls outside the protection of the First Amendment. Accordingly, we evaluate facts that have been deemed to have constitutional significance. *See Bose*, 466 U.S. at 505, 104 S.Ct. at 1962. If we accepted Newton's suggestion, we would abdicate the constitutional responsibility embedded in the concept of judicial review. Reviewing a television broadcast less carefully because the average viewer sees it only once defies the constitutional values protected by the rule of independent judicial review.

## V

In conclusion, we have applied the holding of the Supreme Court in *Bose* that the clearly erroneous standard of Rule 52(a) of the Federal Rules of Civil Procedure does not prescribe the standard of review to be applied in reviewing a determination of actual malice in a case governed by *New York Times v. Sullivan*. *Bose*, 466 U.S. at 514, 104 S.Ct. at 1967. Our review of the uncontroverted testimony, together with the cumulation of the circumstantial and documentary evidence, reveals almost no evidence of actual malice, much less clear and convincing proof. Accordingly, we REVERSE the judgment entered against appellants. Judgment should be entered dismissing the complaint. The cross-appeal is DISMISSED.

SO ORDERED.

---

**46.** We note in passing that it is exactly this type of careful parsing which Newton earlier requested that we require of NBC, *see supra* section IV B 4.